*Cangemi v. United States*

# United States Court of Appeals
# For the Second Circuit

August Term 2020

Argued: October 23, 2020
Decided: September 7, 2021

No. 19-1076

THOMAS CANGEMI, JODI CANGEMI, MARIANN
COLEMAN, FRANCIS J. DEVITO, LYNN R. DEVITO,
LEON KIRCIK, ELIZABETH KIRCIK, CAROL C. LANG,
TERRY S. BIENSTOCK, DANIEL LIVINGSTON,
VICTORIA LIVINGSTON, ROBIN RACANELLI, JAMES E.
RITTERHOFF, THELMA WEINBERG TRUSTEE OF THE
THELMA WEINBERG REVOCABLE LIVING TRUST,
GALE H. RITTERHOFF,

*Plaintiffs-Appellants*,

ELSIE V. THOMPSON TRUST, JOHN TOMITZ,

*Plaintiffs*,

*v.*

UNITED STATES OF AMERICA, TOWN OF EAST
HAMPTON,

*Defendants-Appellees*,

UNITED STATES ARMY CORPS OF ENGINEERS, COL.
MATTHEW W. LUZZATTO, Commander, United
States Army Corps of Engineers, New York

District, in his official capacity, COL. (RET.) JOHN R. BOULE, II, in his individual capacity, WILLIAM J. WILKINSON, in his individual capacity, COUNTY OF SUFFOLK, STATE OF NEW YORK, BASIL SEGGOS, Commissioner of the New York State Department of Environmental Conservation, in his official capacity, ROSSANA ROSADO, Secretary of the New York State Department of State, in her official capacity,

*Defendants*.*

---

Appeal from the United States District Court
for the Eastern District of New York
No. 12-cv-3989, Joanna Seybert, *Judge*.

---

Before:  RAGGI, SULLIVAN, and NARDINI, *Circuit Judges*.

Plaintiffs-Appellants, property owners in the Town of East Hampton ("Plaintiffs"), appeal from two separate decisions of the district court (Seybert, *J.*) concerning their claims that the jetties abutting Lake Montauk Harbor (the "Jetties") have caused significant erosion on their properties.  In the first decision, the district court dismissed Plaintiffs' Federal Tort Claims Act ("FTCA") claims against Defendant-Appellee the United States for lack of subject matter jurisdiction on sovereign immunity grounds, citing the FTCA's discretionary function exception.  In the second decision, the district court granted judgment as a matter of law to Defendant-Appellee the Town of East Hampton (the "Town")

---

* The Clerk of Court is respectfully directed to amend the official case caption as set forth above. In accordance with Rule 43(c)(2) of the Federal Rule of Appellate Procedure, the following substitutions are made regarding the Defendants in this case:  (1) Col. Matthew W. Luzzatto, Commander of the U.S. Army Corps of Engineers, New York District, is substituted for former Commander Col. (Ret.) John R. Boule, II; (2) Basil Seggos, Commissioner of the New York State Department of Environmental Conservation, is substituted for former Commissioner Joe Martens; and (3) Rossana Rosada, Secretary of the New York State Department of State, is substituted for former Secretary Cesar A. Perales.

2

on Plaintiffs' state-law private nuisance and trespass claims. Plaintiffs argue that the district court erred in both decisions because (1) the FTCA's discretionary function exception does not apply to the United States' management of the Jetties; and (2) the Town, as the owner of the land beneath the Jetties, had a duty to mitigate the erosion caused by the Jetties. We disagree. The district court correctly concluded that Plaintiffs' claims against the United States are barred by sovereign immunity, and we hold that, under New York law, the Town's ownership of the land beneath the Jetties, standing alone, did not give rise to a duty to mitigate any erosion caused by the Jetties.

AFFIRMED.

TIMOTHY F. HILL, Sinnreich Kosakoff & Messina LLP, Central Islip, NY, *for Plaintiffs-Appellants*.

VINCENT LIPARI (Varuni Nelson, Rachel G. Balaban, *on the brief*), Assistant United States Attorneys, *for* Jacquelyn M. Kasulis, Acting United States Attorney for the Eastern District of New York, Central Islip, NY, *for Defendant-Appellee United States of America*.

STEVEN C. STERN, Sokoloff Stern LLP, Carle Place, NY, *for Defendant-Appellee Town of East Hampton*.

RICHARD J. SULLIVAN, *Circuit Judge*:

Plaintiffs-Appellants, seaside property owners in the Town of East Hampton, New York ("Plaintiffs"), appeal from a final judgment of the district court in favor of Defendants-Appellees the United States and the Town of East Hampton (the "Town"). Plaintiffs challenge two decisions of the district court. In the first decision, the district court dismissed Plaintiffs' Federal Tort Claims Act

("FTCA") claims against the United States for lack of subject matter jurisdiction on sovereign immunity grounds, citing the FTCA's discretionary function exception. *See Cangemi v. United States*, No. 12-cv-3989 (JS), 2017 WL 1274060, at *1 (E.D.N.Y. Mar. 31, 2017) ("*Cangemi III*"); Fed. R. Civ. P. 12(b)(1).[1] In the second, the district court granted the Town's motion for judgment as a matter of law after trial on Plaintiffs' state-law private nuisance and trespass claims. *See Cangemi IV*, 374 F. Supp. 3d at 231, 239; Fed. R. Civ. P. 50(b). On appeal, Plaintiffs argue that (1) the FTCA's discretionary function exception does not apply to the federal government's management of the jetties abutting Lake Montauk Harbor; and (2) the Town was not entitled to judgment as a matter of law because, as the owner of the land underneath the jetties, it had a duty to mitigate erosion caused by those jetties. For the reasons set forth below, we reject these arguments and affirm the district court's judgment.

---

[1] Although Plaintiffs directly challenge only two of the district court's decisions, the district court issued four decisions involving the key issues on appeal: (1) *Cangemi v. United States*, 939 F. Supp. 2d 188 (E.D.N.Y. 2013) ("*Cangemi I*"); (2) *Cangemi v. United States*, No. 12-cv-3989 (JS), 2016 WL 915173 (E.D.N.Y. Mar. 7, 2016) ("*Cangemi II*"); (3) *Cangemi III*, 2017 WL 1274060; and (4) *Cangemi v. Town of East Hampton*, 374 F. Supp. 3d 227 (E.D.N.Y. 2019) ("*Cangemi IV*").

I. BACKGROUND

**A.      Facts**

**1.      The Jetties and Lake Montauk Harbor Federal Navigation Project**

This case centers around two rock jetties standing at the mouth of Lake Montauk Harbor, which is located in the Town of East Hampton on the northern shore of the south fork of Long Island.  The Lake Montauk Harbor jetties (the "Jetties") stabilize the inlet and provide access to the harbor, which houses a U.S. Coast Guard station and serves as the largest commercial fishing port in New York.  The Jetties were first constructed in 1926 by a private development company managed by entrepreneur Carl Fisher, who owned much of the land surrounding Lake Montauk Harbor and used it primarily as a private yacht club.

Fisher's development company went into receivership during the Great Depression, so representatives from the Town of East Hampton urged the federal government to preserve access to the harbor.  In response to these efforts, the U.S. Army Corps of Engineers ("USACE") surveyed the harbor and informed Congress that federal intervention to improve and maintain Lake Montauk Harbor was justified because it was the only harbor of refuge within fifty miles for large vessels navigating near the east end and South Fork of Long Island during rough weather,

and because the harbor benefitted the public by providing recreational and economic opportunities for the community. The USACE issued its recommendation to Congress in part because Fisher's development company had agreed to convey to the United States, free of charge, all right of way to Lake Montauk Harbor, its bed, shores, and structures, and to dedicate them to permanent, public use as a navigable waterway.

To facilitate the federal government's involvement, in 1941, Fisher's development company transferred to the Town title to the Jetties and the land under Lake Montauk Harbor. In 1942, the Town then granted the federal government a permanent easement to use and develop the Jetties, the channel, and the waters of Lake Montauk Harbor as a Federal Navigation Project ("FNP"). The Town retained, and still retains, legal title to the Jetties and the land underneath Lake Montauk Harbor.

Congress formally approved the Lake Montauk Harbor FNP under the Rivers and Harbors Act of 1945. *See* Pub. L. No. 79-14, § 2, 59 Stat. 10, 13 (1945). As an FNP, the Jetties, channel, and waters of Lake Montauk Harbor fell under the exclusive authority of the federal government. But in 1962, as a condition of continued federal involvement, the Town executed an "Assurance of Local

Cooperation" with the federal government, in which the Town reauthorized its 1942 easement and agreed to indemnify the federal government for "claims for damages that may occur from the construction and maintenance of the improvements" to Lake Montauk Harbor as part of the FNP. App'x at 4605.

Federal development of the harbor was completed in 1968, when the east and west Jetties were repaired and extended to their current lengths. Although the design of the Jetties has remained unchanged since 1968, the USACE repaired the eastern jetty in 1995 and performed periodic dredging of the Lake Montauk Harbor channel from 1966 to 2011. To this day, the USACE maintains the Jetties pursuant to the FNP; the Town does not control or manage them.

## 2. The 1991 Resolution and Reconnaissance Study

In 1991, the Senate Committee on Environmental and Public Works asked the USACE to "determin[e] if further improvements for navigation [were] advisable" in Lake Montauk Harbor. *Id.* at 385. As a general matter, when the USACE receives such congressional authority, it investigates possibilities for federal improvement and issues a "reconnaissance study," which is a preliminary

document stating whether federal interests exist in continuing to the next development phase – the issuance of a "feasibility study."[2]

In May 1995, the USACE completed the Lake Montauk Harbor Reconnaissance Study, which reported that navigation into Lake Montauk Harbor had become difficult due to deterioration of the east Jetty. The Reconnaissance Study recommended rehabilitating the Jetties, deepening the channel at the entrance to Lake Montauk Harbor, and using dredged and "bypassed" sand to replenish the shoreline to the west of the Jetties, which had experienced erosion.[3]

### 3.      The Feasibility Cost Sharing Agreement

The USACE's 1995 Reconnaissance Study concluded that a feasibility study was needed to chart a course of action for rehabilitating Lake Montauk Harbor. In broad strokes, a feasibility study provides a detailed report of all engineering, design, and real estate activities required for a development project. *See* 33 U.S.C. § 2282(a)(2); *Army Corps of Engineers* at 11–12. Unlike a reconnaissance study, a

---

[2] *See* Nicole T. Carter & Charles V. Stern, Cong. Rsch. Serv. R41243, *Army Corps of Engineers: Water Resource Authorizations, Appropriations, and Activities* 7–9 (2017) (hereinafter "*Army Corps of Engineers*").

[3] In this context, sand "dredging" referred to the removal of sand from the already-existing channel, while sand "bypassing" referred to the transportation of sand from the eastern shoreline to the western shoreline via truck, barge, or temporary hydraulic pipeline.

feasibility study is a complete decision document that presents a final recommendation to Congress. *Army Corps of Engineers* at 12. Congress may then accept or reject the USACE's recommendation, as only Congress has the final authority to approve and fund a project. *Id.*

The USACE cannot begin a feasibility study without a "feasibility cost sharing agreement" with a nonfederal sponsor that commits to sharing 50% of the cost of the study. *See* 33 U.S.C. § 2215(a)(1)(A). To that end, in February 2002, the USACE entered into a feasibility cost sharing agreement (the "FCSA") with the New York State Department of Environmental Conservation. The FCSA provides, at Article II.A., that the USACE "shall expeditiously prosecute and complete the [Lake Montauk Harbor Feasibility] Study." App'x at 423. Further, Article X.A. of the FCSA states that either party may terminate the FCSA upon thirty days' written notice, and that upon such termination, "both parties shall conclude their activities relating to the [Feasibility] Study and proceed to a final accounting." *Id.* at 427. The preamble to the FCSA also specifies that nothing in the agreement "obligates either party to implement a project." *Id.* at 422.

**4.      The Feasibility Scoping Meeting, 3x3x3 Paradigm, and DRAA**

Progress on the Lake Montauk Harbor Feasibility Study ("LMH Study") slowed to a crawl in the years following the signing of the FCSA. Nevertheless, in September 2006, the USACE held a meeting for the LMH Study to explore different alternatives for the completed development project.

On February 8, 2012, Major General Michael J. Walsh, Deputy Commanding General for the USACE's Civil and Emergency Operations, issued a memorandum establishing the "3x3x3 Paradigm," which provided that certain USACE feasibility studies should be completed within three years, cost no more than three million dollars, and have three levels of review. Importantly, the 2012 memorandum made clear that the 3x3x3 Paradigm would apply only to feasibility studies that "ha[d] not reached a Feasibility Scoping Meeting (FSM) by 31 December 2011." *Id.* at 2053.

Anthony Ciorra, former Chief of the Civil Works Branch of the Programs and Project Management Division of the USACE New York District, testified that the September 2006 meeting for the LMH Study qualified as a "feasibility scoping meeting" within the meaning of the 3x3x3 Paradigm. *Id.* at 2046. Moreover, on April 3, 2014, the USACE updated its Lake Montauk Harbor Project Management

10

Plan to confirm that an "Alternatives" meeting – "another term used to refer to a feasibility scoping meeting" – had taken place in September 2006. *Id.* at 2047–48. Ciorra testified (and a strategy paper appended to the Project Management Plan confirmed) that, in light of the completion of this Feasibility Scoping Meeting prior to December 31, 2011, the LMH Study was "grandfathered" – *i.e.*, it was exempted from the requirements of the 3x3x3 Paradigm. *Id.* at 2046, 2048, 2061, 2094.

On January 29, 2013, Congress enacted the Disaster Relief Appropriations Act of 2013 ("DRAA"), which provided federal funding for various USACE feasibility studies, including the LMH Study, for projects that would help remediate damage caused by Superstorm Sandy. *See* Pub. L. No. 113-2, tit. II, 127 Stat. 4, 5 (2013). On April 13, 2015, Joseph Vietri, Chief of the Policy and Planning Division for the USACE North Atlantic Division, issued a memorandum setting "proposed . . . milestone" dates for feasibility studies "being conducted under the [DRAA]." App'x at 2101. Pursuant to this memorandum, the proposed completion date of the LMH Study was set for April 17, 2017. As of April 19, 2019

11

– the date that Plaintiffs filed their Notice of Appeal – the final LMH Study Report had not yet been issued.[4]

### 5. The Lake Montauk Harbor Feasibility Study

During the course of its work on the LMH Study, the USACE considered twelve different options for improving the navigation into Lake Montauk Harbor and nine different options for reducing storm damage and shoreline erosion around Lake Montauk Harbor. The USACE rejected some of these alternatives for various reasons, including cost and efficacy. For instance, although the USACE appeared to recognize that the Jetties contributed to erosion on the western shoreline, it rejected a plan that would have addressed that erosion by modifying the Jetties. It explained that "[u]nless both Jetties are removed and [the] channel [is] closed, partial modification would not meet the purpose of restoring natural sediment transport . . . to prevent downdrift beach erosion." *Id.* at 482–83. The

---

[4] According to the USACE's website, of which we may take judicial notice, *see 23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 183 n.7 (2d Cir. 2012), the USACE issued a draft feasibility report for public review in July 2019, and a final report was approved in February 2021. *See* USACE, *Fact Sheet – Lake Montauk Harbor Feasibility Study, NY*, USACE New York District Website (Apr. 9, 2021), https://www.nan.usace.army.mil/Media/Fact-Sheets/Fact-Sheet-Article-View/Article/487490/fact-sheet-lake-montauk-harbor-feasibility-study/.

USACE further noted that altering the Jetties would "contradict[] the navigation channel improvement purpose" of the plan. *Id.*

At a public meeting in March 2014, the USACE gave a presentation discussing three specific proposals for developing the Lake Montauk Harbor FNP. One option was to take no action. *Id.* at 509. "Alternative 1" was a "Navigation Only Plan," which involved deepening the channel, placing the dredged material on the western shoreline, and dredging on a five-year cycle, for a total cost of approximately $26 million. *Id.* at 510, 513. Another option, "Alternative 2," was a "Navigation and Coastal Storm Risk Management Plan," which involved all of the development under Alternative 1 but also included bypassing approximately 230,000 cubic yards of sand to address erosion on the western shoreline and continued sand bypassing on a regular basis. *Id.* at 511. Alternative 2 had an estimated cost of $41 million. *Id.* at 513.

6. **The Town's Efforts to Mitigate Erosion**

As discussed above, once the Town ceded control of the Jetties to the USACE, it no longer managed the Jetties themselves or the navigable waters of Lake Montauk Harbor. The Town did, however, recognize that the Jetties appeared to cause erosion to the shoreline to the west of the Jetties. As early as

13

1994, Town representatives wrote to the USACE requesting the federal government's assistance in addressing "the severe downdrift scouring caused by the Federal jetties." *Id.* at 4617. And the Town undertook its own efforts to address erosion, including a Local Waterfront Revitalization Program ("LWRP"). The final LWRP report, approved by the New York Secretary of State in 2007, acknowledged that the Jetties caused "downdrift scouring" to the beaches along Soundview Drive to the west of the Jetties. *Id.* at 6062.

Consistent with the observations made in the LWRP report, the Town also proposed a sand bypass plan to address erosion to the west of the Jetties. Under that proposal, the Town would transport 5,000 to 10,000 cubic yards of surplus sand from the Town-owned portion of Gin Beach (east of the Jetties) to the eroded Soundview Drive shoreline to the west. This sand bypass plan progressed to the point that the Town Board approved resolutions to proceed with the project, and permits were obtained to perform the work. Town representatives also attended meetings with state representatives regarding other sand bypass options that would not require federal involvement. Ultimately, however, the Town never commenced any of these sand bypass projects.

14

## B.    Procedural History

### 1.    State Court Action and *Cangemi I*

The parties' long-winding litigation began in January 2011, when Plaintiffs, a group of Montauk residents owning property west of the Jetties, sued the Town, Suffolk County, the State of New York, and several New York state officials in New York state court.  The Plaintiffs asserted various state common-law claims, as well as state and federal constitutional claims, all premised on the erosion caused by the Jetties and the Town's and New York's failure to mitigate that erosion.  On February 17, 2012, the New York Supreme Court dismissed Plaintiffs' state complaint on the ground that the United States was a necessary party because it was "the entity that performed the repairs and extensions of the [J]etties pursuant to the [FNP] and would be involved in mitigation measures."  *Cangemi v. Town of East Hampton*, 2012 N.Y. Slip Op. 30538(U), at 4 (Sup. Ct. Feb. 17, 2012).

Plaintiffs then commenced this action in federal court against the Town and the United States on June 14, 2012.[5]  In their operative Amended Complaint, filed

_____

[5] Plaintiffs also named as defendants the State of New York, Suffolk County, several New York state officials, a Town official, the USACE, and a USACE official, but those additional defendants were subsequently dismissed from the case (either by stipulation or by order of the district court), and Plaintiffs do not challenge those dismissals on appeal.  In addition, while Plaintiffs originally

15

September 14, 2012, Plaintiffs asserted three claims relevant to this appeal.  First, Plaintiffs alleged that both the Town and the United States were liable for private nuisance, under New York law, on the theory that the Jetties (owned by the Town and controlled by the federal government) interrupted "the natural east-to-west littoral movement of . . . sand," resulting in severe erosion to Plaintiffs' properties.  App'x at 53.  Second, Plaintiffs alleged that – for essentially the same reasons – "[t]he design, construction, maintenance[,] and continued presence of the Jetties constitute[d] . . . an absolute public nuisance."  *Id.* at 59.  Third, Plaintiffs alleged that the Town and the United States were liable for trespass, under New York law, on the theory that the Jetties caused the "unauthorized entry and acceleration of waters" onto Plaintiffs' property.[6]  *Id.* at 64.

---

filed their complaint in the Southern District of New York, the parties agreed to transfer the case to the Eastern District of New York in August 2012.

[6] Plaintiffs also alleged additional claims against the Town and the United States that are not directly at issue in this appeal, including:  (1) New York common-law claims for (a) negligence, (b) unjust enrichment, and (c) appropriation of resources; (2) denial of due process under the U.S. Constitution; (3) denial of equal protection under the U.S. Constitution; (4) unlawful taking of property under the U.S. Constitution; (5) unlawful taking of property under the New York Constitution; and (6) as to the United States only, violation of the Administrative Procedure Act.

On August 27, 2012, the Town moved to dismiss Plaintiffs' amended complaint.[7] As relevant to this appeal, the Town argued that Plaintiffs failed to plausibly allege their private nuisance claim because they made no allegations that the Town had (1) acted intentionally to create erosion on Plaintiffs' properties or (2) acted negligently, since the Town had no duty to mitigate the effects of the Jetties that were operated entirely by the federal government. The Town also argued that Plaintiffs failed to properly plead their trespass claim because they failed to allege the requisite level of intent to give rise to a trespass.

In a March 29, 2013 memorandum and order, the district court denied the Town's motion to dismiss Plaintiffs' private nuisance, public nuisance, and trespass claims. *Cangemi I*, 939 F. Supp. 2d at 205–07. In pertinent part, the district court held that Plaintiffs plausibly alleged that the Town had engaged in intentional or negligent conduct with respect to the Jetties, such that the Town could be liable for nuisance and trespass. *Id.* at 198, 203–05. Moreover, the district court rejected the Town's argument that it did not have a duty to mitigate the

---

[7] More precisely, the Town moved to dismiss Plaintiffs' *original* complaint, but because Plaintiffs' amended complaint did not substantially alter the claims against the Town, the parties agreed – and the district court ordered – that the Town's motion to dismiss would be applied to the amended complaint.

17

effects of the Jetties, reasoning that, as alleged in the amended complaint, the Town was more than "a mere instrumentality" of the federal government in managing the Jetties. *Id.* at 205 n.9 (internal quotation marks omitted).[8]

## 2. *Cangemi II* and *III*

On March 6, 2015, the United States filed a motion to dismiss for lack of subject matter jurisdiction, asserting that Plaintiffs' claims against it were barred by the doctrine of sovereign immunity. Specifically, the United States argued that Plaintiffs' tort claims (including their private nuisance and trespass claims) fell within the FTCA's discretionary function exception, meaning that the United States had not waived its sovereign immunity as to such claims. The United States argued that the USACE was not subject to any mandatory directive prescribing a certain course of conduct with respect to the Jetties or the Lake Montauk Harbor FNP, and that the USACE's management of the Jetties was grounded in questions of public policy – the two elements necessary to satisfy the discretionary function exception.

---

[8] In that same decision, the district court dismissed several of Plaintiffs' other claims – including their federal takings, due process, and equal protection claims – on the ground that they were barred by the relevant statutes of limitations. *See id.* at 199–201.

18

Initially, the district court denied the United States' motion to dismiss in a March 7, 2016 memorandum and order. *Cangemi II*, 2016 WL 915173, at *7. The court agreed with the United States that the USACE's management of the Jetties (including the LMH Study) was "either grounded in policy concerns or, at the very least, susceptible to policy analysis." *Id.* at *5 n.4. But the court concluded that the discretionary function exception did not apply because both the 3x3x3 Paradigm and the LMH Study FCSA "provide[d] a prescribed course of action" – specifically, that the USACE was required to complete the LMH Study within a certain timeframe so that the federal government could respond to the erosion caused by the Jetties. *Id.* at *6–7 (internal quotation marks and alterations omitted).

One year later, however, the district court reversed course. After the United States submitted a motion for reconsideration pointing to evidence in the record that the district court had overlooked, the court granted the United States' motion to dismiss for lack of subject matter jurisdiction. *Cangemi III*, 2017 WL 1274060, at *3–4. Although the court acknowledged that it had already concluded, in *Cangemi II*, that the USACE's actions were susceptible to a policy analysis, it conceded that it had "overlooked the FCSA's termination provision" and other language in the FCSA showing that the FCSA did not impose a mandatory directive. *Id.* at *4. The

19

court also recognized that new materials submitted with the United States' motion (including an affidavit from Anthony Ciorra) made clear that the USACE *had* held a "Feasibility Scoping Meeting" before December 31, 2011, thereby exempting the LMH Study from the 3x3x3 Paradigm. *Id.* at *7. Accordingly, because *Cangemi II* had relied on the FCSA and the 3x3x3 Paradigm as the only sources of mandatory directives imposed on the USACE concerning the Jetties, the district court dismissed Plaintiffs' tort claims against the United States on sovereign immunity grounds. *Id.* at *4.

In the same decision, the district court nevertheless denied the Town's motion for summary judgment on Plaintiffs' private and public nuisance and trespass claims. *Id.* at *10–11. Relying extensively on the reasoning from *Cangemi I*, in which it had denied the Town's motion to dismiss, the court concluded that Plaintiffs' claims against the Town could not "be resolved as a matter of law at [that] stage." *Id.* at *11.

### 3. Trial and *Cangemi IV*

Plaintiffs' state-law private nuisance, public nuisance, and trespass claims against the Town proceeded to trial from June 4 to June 29, 2018. *Cangemi IV*, 374 F. Supp. 3d at 232. At the close of Plaintiffs' case and again at the close of the

Town's case, the Town moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on the grounds that (1) it had no duty to remediate the effects of the Jetties because it lacked control over the Jetties; and (2) it engaged in no intentional conduct that could give rise to liability for nuisance or trespass. *Id.* at 232, 235. The district court reserved decision on the motions and submitted the case to the jury. *Id.* at 232. The jury found for Plaintiffs on their claims for private nuisance and trespass, found for the Town on the public nuisance claim, and awarded Plaintiffs $355,961.27 in compensatory damages. *Id.* After the verdict, the Town renewed its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and, alternatively, moved for a new trial pursuant to Rule 59. *Id.*

In a March 15, 2019 memorandum and order, the district court granted the Town's renewed motion for judgment as a matter of law. *Id.* at 231, 238. Although "mindful" of its prior orders, in which it had stated "that Plaintiffs had 'at least plausibly suggested that [the Town] can maintain the Jetties without creating a nuisance or trespass by remedial actions,'" *id.* at 234 (quoting *Cangemi I*, 939 F. Supp. 2d at 198); *see also Cangemi III*, 2017 WL 1274060, at *8, the district court concluded that "the evidence at trial . . . convinced th[e] [c]ourt that the Town

21

simply could not and did not exercise control over the [J]etties sufficient to impose liability on it." *Cangemi IV*, 374 F. Supp. 3d at 234.

With respect to Plaintiffs' private nuisance claim, the district court held that, because the Town lacked control over the Jetties, Plaintiffs could not show the necessary intent or causation to prove an intentional private nuisance, since the Town was a "mere instrumentality" of the USACE and did not actually maintain the Jetties. *Id.* at 235 (internal quotation marks omitted). And although the court recognized that the *failure* to act can in some circumstances give rise to nuisance liability under New York law, such liability was inappropriate in this case because the Town was under no legal duty to act given its lack of control over the Jetties. *Id.* at 236. The court similarly concluded that, because the Town had no duty to act, Plaintiffs could not show *negligent* private nuisance. *Id.* at 237.

With respect to Plaintiffs' trespass claim, the district court again focused on the Town's lack of intentional conduct concerning the Jetties, explaining that because "the Town did not act intentionally and willfully or negligently . . . , no

22

reasonable fact-finder could have found it liable for the intrusion of water upon Plaintiffs' property." *Id.* at 238.[9]

Following the district court's decision and entry of the final judgment, Plaintiffs filed a timely notice of appeal.

## II. DISCUSSION

On appeal, Plaintiffs principally challenge two of the district court's decisions. First, they contend that the district court erred when it dismissed their tort claims against the United States on sovereign immunity grounds, arguing that those claims are not barred by the FTCA's discretionary function exception. Second, they argue that the district court improperly granted the Town's renewed motion for judgment as a matter of law because Plaintiffs' private nuisance and trespass claims were established at trial through evidence showing that the Town knew of harm caused by the Jetties but failed to remediate that harm, and through evidence showing that the Town authorized the building of the Jetties and derived a benefit from them. We address each of these challenges in turn.

---

[9] In the alternative, the district court granted the Town's motion for a new trial. *Id.* at 238. Essentially for the same reasons that it granted the Town's renewed motion for judgment as a matter of law, the court concluded that "the verdict was against the weight of the evidence" because "[t]he Town did not control the [J]etties, could not and did not engage in conduct, and lacked the requisite intent." *Id.*

23

## A. Plaintiffs' Claims Against the United States

On appeal from a dismissal pursuant to Rule 12(b)(1), including on sovereign immunity grounds, we review a district court's legal conclusions *de novo* and factual findings for clear error.[10] *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Id.*

"Absent an unequivocally expressed statutory waiver, the United States . . . [is] immune from suit based on the principle of sovereign immunity." *County of Suffolk v. Sebelius*, 605 F.3d 135, 140 (2d Cir. 2010) (internal quotation marks omitted). The FTCA provides for a limited waiver of sovereign immunity for "injury or loss of property . . . caused by the negligent or wrongful act or omission" of a federal government employee "acting within the scope of his office or

---

[10] As a technical matter, Plaintiffs challenge the district court's grant of the United States' motion for reconsideration, a decision we have previously reviewed for abuse of discretion. *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). But because an error of law constitutes an abuse of discretion, *see RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 316 (2d Cir. 2003), and because Plaintiffs challenge the district court's dismissal under 12(b)(1), not its decision to reconsider its earlier order, we review the district court's dismissal *de novo*, cf., e.g., *Bayerische Landesbank v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 52 n.3 (2d Cir. 2012) (declining to review district court's order denying a motion for reconsideration for abuse of discretion because that decision was "essentially an affirmance" of the district court's prior ruling "on the merits" (internal quotation marks omitted)).

employment." 28 U.S.C. § 1346(b)(1). But the FTCA is limited by a number of exceptions, including the so-called "discretionary function exception," which bars "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Thus, for acts that fall under the discretionary function exception, the United States has not waived its sovereign immunity, and federal courts lack subject matter jurisdiction over claims premised on those acts. *See Fazi v. United States*, 935 F.2d 535, 537 (2d Cir. 1991).

The Supreme Court has developed a two-part framework, known as the "*Berkovitz/Gaubert*" test, for determining whether the discretionary function exception applies to a given claim. *See United States v. Gaubert*, 499 U.S. 315, 322–23 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988). Under the *Berkovitz/Gaubert* test, the discretionary function exception bars a claim where "(1) the acts alleged to be negligent [or wrongful] . . . [are] discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation and (2) the judgment or choice in question [is] . . . grounded in

25

considerations of public policy or susceptible to policy analysis." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (internal quotation marks omitted).

Because plaintiffs bear the initial burden of showing that their claims against the United States fall within the FTCA's limited waiver of sovereign immunity, plaintiffs also bear the initial burden of showing that their claims are not barred by the discretionary function exception. *See Molchatsky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013) (citing *Gaubert*, 499 U.S. at 324–25). Plaintiffs can overcome a motion to dismiss premised on the discretionary function exception by showing that *either* (1) the United States' allegedly tortious act (or failure to act) was inconsistent with a "specific mandatory directive" – *i.e.*, a "federal statute, regulation, or policy [that] specifically prescribes a course of action for [the federal government] to follow," *Berkovitz*, 486 U.S. at 536, 544; *or* (2) the allegedly tortious "judgment or choice in question" is not "grounded in considerations of public policy or susceptible to policy analysis," *Coulthurst*, 214 F.3d at 109 (internal quotation marks omitted).

Here, Plaintiffs challenge the district court's dismissal of their claims against the United States on both grounds. First, Plaintiffs argue that the USACE was subject to and violated two sources of mandatory directives: (1) the FCSA and

(2) the 3x3x3 Paradigm. Plaintiffs contend that both of these directives required the USACE to conduct the LMH Study within a prescribed timeframe, and that the USACE failed to complete the LMH Study within that timeframe. Second, Plaintiffs argue that the extensive and unjustified delays associated with the LMH Study were not grounded in considerations of public policy. But as the district court correctly concluded, neither the FCSA nor the 3x3x3 Paradigm actually imposed upon the USACE a mandatory timeline for completing the LMH Study. *See Cangemi III*, 2017 WL 1274060, at *4. And while Plaintiffs are correct that the LMH Study experienced significant (and largely unexplained) delays, the district court properly recognized that the USACE was afforded substantial discretion in undertaking that feasibility study and managing the FNP at Lake Montauk Harbor – including the discretion *not* to take any action to mitigate the adverse effects of the Jetties. *See id.*; *Cangemi II*, 2016 WL 915173, at *5 n.4. Accordingly, the district court correctly found that both parts of the *Berkovitz/Gaubert* test were satisfied and properly dismissed Plaintiffs' FTCA claims against the United States.

### 1. Neither the FCSA nor the 3x3x3 Paradigm imposes a mandatory directive.

Though Plaintiffs look to the FCSA as the source of a mandatory directive, the very first section of that agreement makes clear that "entering into this

27

Agreement in no way obligates either" the State of New York or the federal government "to implement a project," and that "whether the [federal government] supports a project authorization and budgets it for implementation depends upon, among other things, the outcome of the [LMH] Study and whether the proposed solution is consistent with the . . . budget priorities of the Administration." App'x at 422. Article X.A. of the FCSA also provides that the federal government can terminate or suspend the agreement at any point prior to submitting the "feasibility report to the Office of Management and Budget" upon thirty days' written notice. *Id.* at 422, 427. Upon such termination, "both parties shall conclude their activities relating to the [LMH] Study and proceed to a final accounting . . . ." *Id.* at 427. These provisions in the FCSA reveal that the federal government was free to walk away from the LMH Study at any point.

Plaintiffs' sole argument for a mandatory directive in the FCSA comes from Article II.A., which provides that the federal government "shall expeditiously prosecute and complete the [LMH] Study." *Id.* at 423. The district court correctly rejected this argument for two key reasons. First, the term "expeditiously" is "undefined and does not constitute a fixed or readily ascertainable standard to prevent the government's conduct from falling into the discretionary function

exception." *Cangemi III*, 2017 WL 1274060, at *4 n.7 (internal quotation marks, alterations, and emphasis omitted). Indeed, Plaintiffs do not point to any specified time at which their claims premised on the FCSA accrued.

Second, Plaintiffs' reading of Article II.A. imposes an artificial obligation on the USACE to actually *complete* the LMH Study, which directly conflicts with the FCSA's preamble and Article X.A. Under Plaintiffs' theory, the USACE was under a mandatory duty to complete the LMH Study (in some "expeditious[]" yet undesignated timeframe), even though the USACE was explicitly under no obligation to complete any final project and could terminate the FCSA – automatically triggering the end of the LMH Study – upon thirty days' written notice. Plaintiffs' narrow reading of Article II.A. thus ignores the substantial discretion afforded to the USACE by the rest of the FCSA, and the district court properly held that the FCSA did not give rise to a mandatory directive.

Plaintiffs' arguments premised on the USACE's 3x3x3 Paradigm policy fare no better. The 3x3x3 Paradigm imposed a three-year timeline for the feasibility studies to which it applied, but the memorandum announcing the 3x3x3 Paradigm explicitly stated that this timeline applied only to "feasibility studies that have *not* reached a Feasibility Scoping Meeting . . . by 31 December 2011." App'x at 2053

29

(emphasis added).  As part of its motion to dismiss Plaintiffs' action for lack of subject matter jurisdiction, the United States submitted an undisputed declaration by Anthony Ciorra, an updated Lake Montauk Harbor Project Management Plan, and a USACE strategy paper appended to that Plan, all making clear that the "Feasibility Scoping Meeting" for the LMH Study occurred in September 2006. *See id.* at 2046–48, 2061, 2084, 2094.  The materials submitted with the United States' motion to dismiss thus reflect that the LMH Study did not violate the 3x3x3 Paradigm because it was "grandfathered" and therefore exempt. *Id.* at 2094.

Plaintiffs argue that the Ciorra declaration is "self-serving" and should not have been credited by the district court.  But while the declaration was surely "self-serving" in the sense that it supported the United States' contention that the district court lacked subject matter jurisdiction, it was supported by references to the updated Lake Montauk Harbor Project Management Plan, the internal USACE strategy paper, and Ciorra's prior deposition testimony.  After the United States presented this evidence supporting its motion to dismiss, it was *Plaintiffs'* burden to come forward with evidence supporting their assertion of jurisdiction. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (explaining that when plaintiffs oppose a motion to dismiss for lack of subject matter jurisdiction

supported by evidence outside the pleadings, they "need to come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion reveal the existence of factual problems in the assertion of jurisdiction" (internal quotation marks and alterations omitted)). Because they did not do so, the district court was entitled to rely on the Ciorra declaration, which conclusively establishes that the LMH Study was exempt from the strictures of the 3x3x3 Paradigm.[11]

### 2. The LMH Study is susceptible to policy analysis.

The district court also correctly held that the United States satisfied the second prong of the *Berkovitz/Gaubert* test because the LMH Study – along with the USACE's management of the FNP at Lake Montauk Harbor – is "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Congress has enumerated a multitude of policy concerns that must be balanced in any USACE feasibility study, including

---

[11] To the extent that Appellants argue that the LMH Study was subject to a mandatory deadline by virtue of the April 2015 USACE memorandum that set "start and end milestone dates" for the LMH Study pursuant to the DRAA, App'x at 2101–03, we also reject that memorandum as a source of a mandatory directive. Appellants appear to conflate the 3x3x3 Paradigm with the separate timeline established in the April 2015 memorandum. But putting that confusion aside, neither the DRAA nor the 2015 memorandum imposed a *mandatory* timeline for completion of the LMH Study. The 2015 memorandum merely established "proposed . . . milestone[s]" for completion. *Id.* at 2101. Accordingly, Appellants have not met their burden of showing that the deadlines imposed by this 2015 memorandum were mandatory rather than "involv[ing] an element of judgment or choice." *Coulthurst*, 214 F.3d at 109 (internal quotation marks omitted).

31

"the economic, environmental, and social benefits and detriments of the recommended plan and alternative plans considered by the Secretary and . . . the public acceptability, and the purposes, scope, and scale of the recommended plan." 33 U.S.C. § 2282(a)(2). Moreover, as the district court recognized, decisions regarding whether to ultimately approve and fund a given FNP are grounded in policy and thus are exclusively for Congress. *See Cangemi II*, 2016 WL 915173, at *3 ("[T]he decision to approve a USACE project is for Congress, not the judiciary." (citing *County of Vernon v. United States*, 933 F.2d 532, 535 (7th Cir. 1991)). Accordingly, the USACE's management of the Lake Montauk Harbor FNP and the LMH Study are clearly susceptible to policy analysis.

Plaintiffs appear to argue that, even though these authorities granted the USACE broad discretion in conducting the LMH Study and operating the Lake Montauk Harbor FNP, the United States cannot satisfy the second prong of the *Berkovitz/Gaubert* test because the USACE *in this case* did not actually undertake a policy analysis in declining to abate the erosion caused by the Jetties in a timely manner. The record evidence undermines the assertion that the USACE failed to undertake a policy analysis in this case: the USACE weighed at least twelve different alternatives for improving navigation into Lake Montauk Harbor and

32

presented three of those in a public meeting in March 2014. *See* App'x at 478–83, 509. One of the three "Alternatives" presented at the meeting was to take no action to expand the FNP at Lake Montauk Harbor or to mitigate the effects of the erosion caused by the Jetties. *See id.* at 509. As noted above, the discretionary function exception applies not only where the federal government has *actually* undertaken a public policy analysis, but also where the decision at issue is merely "*susceptible to policy analysis.*" *Gaubert*, 499 U.S. at 325 (emphasis added). Thus, even if the USACE had failed to engage in a policy analysis here, the broad discretion afforded to the USACE in undertaking the LMH, alone, is enough to satisfy the second prong of the *Berkovitz/Gaubert* test.

In sum, because neither the FCSA nor the 3x3x3 Paradigm prescribes a specific course of action abridging the USACE's broad discretion in carrying out the LMH Study, and because that study and the Lake Montauk Harbor FNP are clearly susceptible to policy analysis, Plaintiffs' FTCA claims against the United States were properly dismissed under the discretionary function exception.[12]

---

[12] Because we conclude that the district court properly dismissed Plaintiffs' claims against the United States under the discretionary function exception, we do not reach the United States' alternative argument that the district court also lacked subject matter jurisdiction over Plaintiffs' claims under the FTCA's "private analogue" requirement, 28 U.S.C. §§ 1346(b)(1), 2674, which bars claims "based on governmental action of the type that private persons could not engage in

33

**B.**     **Plaintiffs' Claims Against the Town**

**1.**     **The district court had subject matter jurisdiction over Plaintiffs'
state-law claims.**

Before addressing the merits of the district court's decision to grant

judgment as a matter of law to the Town on Plaintiffs' state-law claims, we must

first determine whether the district court properly exercised jurisdiction over

those claims after it dismissed the last of Plaintiffs' claims against the United States

in 2017. Although neither Plaintiffs nor the Town challenges the district court's

jurisdiction in this regard, "[e]very federal appellate court has a special obligation

to satisfy itself not only of its own jurisdiction, but also that of the lower courts in

a cause under review." *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 398 (2d Cir.

2017) (internal quotation marks omitted).

Here, Plaintiffs' assertion of subject matter jurisdiction over Plaintiffs' state-

law claims against the Town appears to be premised on the existence of

supplemental jurisdiction under 28 U.S.C. § 1367(a).[13] Ordinarily, where a plaintiff

_____

and hence could not be liable for under local law." *Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012) (internal quotation marks omitted).

[13] Neither Plaintiffs' amended complaint nor any of the district court's decisions cites to a specific statutory basis for subject matter jurisdiction over the Plaintiffs' state-law claims against the Town. While those claims could sound in diversity if Plaintiffs were all residents of states other than New York – after all, it is at least conceivable that the properties in question were all summer

34

has asserted one or more federal claims pursuant to 28 U.S.C. § 1331, we review a district court's exercise of supplemental jurisdiction over additional state-law claims only for abuse of discretion. *See Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 117–18 (2d Cir. 2013). This is true even where a district court exercises supplemental jurisdiction after dismissing all federal claims in a case on the merits. *See Kroshnyi v. U.S. Pack Courier Servs.*, 771 F.3d 93, 102 (2d Cir. 2014). Where a district court dismisses all federal claims under Rule 12(b)(1) of the Federal Rules of Civil Procedure, however, the district court is *precluded* from exercising supplemental jurisdiction over the remaining state-law claims. *See Cohen*, 873 F.3d at 399. This is because, under the supplemental jurisdiction statute, "a district court cannot exercise supplemental jurisdiction unless there is first a proper basis for original federal jurisdiction." *Id.* (internal quotation marks omitted); *see also* 28 U.S.C. § 1367(a) (conferring supplemental jurisdiction "in any civil action of which the district courts have original jurisdiction").

---

homes and that none of the Plaintiffs were New York residents – Plaintiffs' amended complaint appears to foreclose such a scenario, as it states that Plaintiff Robin Racanelli "maintains a residence located in New York County, New York." App'x at 44. Because we conclude that the district court properly exercised supplemental jurisdiction over Plaintiffs' state-law claims against the Town, however, we need not determine whether the district court also could have exercised jurisdiction over those claims under 28 U.S.C. § 1332.

35

Thus, while it ordinarily "makes little practical difference whether the district court labels its dismissal of an action as one for lack of subject matter jurisdiction under Rule 12(b)(1) or for failure to state a claim under 12(b)(6)," the distinction matters in cases like this one where a district court decides to retain jurisdiction over state-law claims after dismissing all federal claims. *Cohen*, 873 F.3d at 399 (internal quotation marks and alterations omitted). Because the district court dismissed Plaintiffs' tort claims against the United States in *Cangemi III* on sovereign immunity grounds, that was a jurisdictional dismissal under Rule 12(b)(1). *See Makarova*, 201 F.3d at 113. Were these claims the only ones purportedly giving rise to supplemental jurisdiction, the district court therefore would have been powerless to retain jurisdiction over Plaintiffs' remaining state-law claims against the Town. *See Cohen*, 873 F.3d at 399.

In an earlier decision, however, the district court dismissed several other federal claims raised by Plaintiffs (against both the Town and the United States) because they were barred by the statute of limitations applicable to 42 U.S.C. § 1983. *See Cangemi I*, 939 F. Supp. 2d at 199–201; *see also supra* note 8. Although the district court did not specify whether it was dismissing those claims under Rule 12(b)(1) or 12(b)(6), the law is clear that "[w]here the dates in a complaint

36

show that an action is barred by a statute of limitations," a motion to dismiss based on the statute of limitations is properly treated as one under Rule 12(b)(6) rather than Rule 12(b)(1). *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989); *see also Harris v. City of New York*, 186 F.3d 243, 247–51 (2d Cir. 1999) (examining motion to dismiss § 1983 claims on statute-of-limitations grounds as one brought under Rule 12(b)(6)). Here, the district court dismissed Plaintiffs' § 1983 claims under the applicable statute of limitations by looking solely to the allegations appearing on the face of Plaintiffs' amended complaint, *see Cangemi I*, 939 F. Supp. 2d at 199–201, so the dismissal is properly treated as one under 12(b)(6). Accordingly, because there was no *jurisdictional* defect with those initial federal claims against the Town (as there was with Plaintiffs' tort claims against the United States that were barred by the discretionary function exception), the district court was not precluded from exercising supplemental jurisdiction over Plaintiffs' state-law claims against the Town. *See Cohen*, 873 F.3d at 400.

Of course, the fact that the district court was not *precluded* from exercising supplemental jurisdiction over Plaintiffs' state-law claims against the Town does not necessarily mean that it did not abuse its discretion in doing so. *See Cohen*, 873 F.3d at 404 (Calabresi, J., concurring) (explaining that, "after all federal claims have

37

been dismissed, the default rule is that federal courts should not decide related state-law claims unless there is good reason for doing so"). But we find no such abuse of discretion here because of the district court's long history with this case and familiarity with the issues by the time it dismissed Plaintiffs' claims against the United States in *Cangemi III*. *See Kroshnyi*, 771 F.3d at 102 (holding that the district court did not abuse its discretion in exercising supplemental jurisdiction, given "the advanced state of the litigation and the [district] [c]ourt's long familiarity with the issues in the case, combined with the likely hardship to both parties should plaintiff be forced to re-file in state court" (internal quotation marks omitted)).

We emphasize, however, that litigants should be diligent in establishing a firm basis for the district court's jurisdiction throughout *all* stages of a case, lest they risk needless and expensive litigation on the merits of an issue that no longer belongs in federal court (or never did in the first instance). "Federal courts are not courts of general jurisdiction," *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986), and district courts "lack the power to disregard such limits as have been imposed by the Constitution or Congress," *Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009). Here, but for the

38

district court's earlier exercise of original jurisdiction over Plaintiffs' federal claims – which were eventually dismissed on statute-of-limitations grounds – the district court would have been powerless to retain jurisdiction over Plaintiffs' state-law claims against the Town following *Cangemi III*, and we would be similarly barred from considering the parties' arguments regarding the merits of those claims.

**2. The district court properly granted the Town's renewed motion for judgment as a matter of law.**

Having determined that the district court properly exercised supplemental jurisdiction over Plaintiffs' state-law claims against the Town, we now turn to the merits of Plaintiffs' challenge to the district court's order granting judgment to the Town as a matter of law on those claims. We review *de novo* a district court's resolution of a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), considering the evidence in the light most favorable to the non-moving party and "giving that party the benefit of all reasonable inferences that the jury might have drawn in [that party's] favor from the evidence." *Legg v. Ulster Cnty.*, 979 F.3d 101, 114 (2d Cir. 2020) (internal quotation marks omitted). A district court may grant such a motion against a party only when "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." Fed. R. Civ. P. 50(a)(1). Plaintiffs argue

that the district court erred in granting the Town's renewed motion for judgment as a matter of law because the jury had a legally sufficient basis for finding the Town liable on Plaintiffs' private nuisance and trespass claims.

### a. Private Nuisance

On appeal, Plaintiffs assert two principal theories for their private nuisance claims against the Town. First, they argue that the Town is liable for private nuisance because it knew that the Jetties (the nuisance) caused erosion on Plaintiffs' properties and it had the ability to mitigate that erosion (primarily through sand bypass projects) but failed to do so. Second, Plaintiffs argue that the Town consented to the creation of the Jetties and derived a benefit from those Jetties, which serves as an alternative basis for nuisance liability. Although the district court previously denied the Town's motion to dismiss and motion for summary judgment on similar grounds, it ultimately reached the correct conclusion when it rejected Plaintiffs' theories of nuisance liability and granted judgment as a matter of law in favor of the Town. The jury lacked a legally sufficient basis for finding in favor of Plaintiffs on their New York private nuisance claims because (1) the Town did not construct the Jetties and (2) the Town did not

40

and could not control the Jetties, which were the sole responsibility of the federal government.

Under New York law, a private nuisance claim may be brought under the theory that a defendant intentionally interfered with others' right to enjoy their land or that a defendant's negligence caused an interference with others' right to enjoy their land. *See Copart Indus. v. Consol. Edison Co.*, 41 N.Y.2d 564, 569 (1977) (citing Restatement (Second) of Torts § 822 (Am. L. Inst. 1975)). Where intentional nuisance is alleged, plaintiffs must prove five elements: "(1) an interference substantial in nature, (2) intentional in origin, [and] (3) unreasonable in character, (4) with a person's property right to use and enjoy land, (5) caused by another's conduct in acting or failing to act." *Id.* at 570. Where "a nuisance has its origin in negligence, negligence must be proven." *Id.* at 569 (internal quotation marks omitted).

Whether a nuisance action is premised on intentional conduct or negligence, "the duty to abate a private nuisance existing on real property arises from the power to possess the property and control the activities that occur on it." *Taggart v. Costabile*, 14 N.Y.S.3d 388, 392 (2d Dep't 2015). As such, a landowner that has relinquished control of its property "will not be liable for private nuisance that

41

arises on the property if the landowner neither created the nuisance nor had notice of it at the time that possession of the property was transferred." *Id.*

The record reveals that the Jetties were first built by a private development company in 1926, and that the Town obtained a deed to the Jetties and the land underneath in 1941 to facilitate granting a permanent easement to the federal government to take control of the Jetties. At trial, Plaintiffs did not present any evidence suggesting that the Town constructed, repaired, or maintained the Jetties. Nor could they have, as federal law prohibits the Town from interfering with the Jetties and the Federal Navigation Project at Lake Montauk Harbor. *See, e.g.*, 33 U.S.C. § 408. Moreover, at trial, a USACE representative testified that "maintenance responsibilities for the federal project [at Lake Montauk Harbor] are 100 percent federal," App'x at 3589, and several Town witnesses testified to the same. Indeed, Plaintiffs concede in their reply brief that "if the Town were to dismantle the [J]etties this would run afoul of the easement and of the [USACE's] navigational mandate." Pls.' Reply Br. at 7.

Despite acknowledging that the Town had no ability to control the Jetties, Plaintiffs contend that "[t]his case has never been about such an absurd postulation." *Id.* at 7–8. Rather, they argue that the Town should be held liable

for private nuisance because (1) it still owns the property on which the Jetties are located, (2) the Town was aware of the erosion occurring on Plaintiffs' properties, and (3) the Town could have taken remedial measures to address the erosion, such as undertaking a sand bypass project. But far from being "an absurd postulation," *id.* at 7–8, the Town's lack of control over the Jetties definitively resolves Plaintiffs' private nuisance claims.

As the Second Department has explained, "the duty to abate a private nuisance existing on real property arises from the power to possess the property and control the activities that occur on it." *Taggart*, 14 N.Y.S.3d at 392. This principle dates back almost a century to the decision of the New York Court of Appeals in *Wilks v. New York Telephone Co.*, 243 N.Y. 351 (1926), in which the court held that a landowner that did not originally construct the nuisance at issue (a faulty telephone wire) could not be held liable for private nuisance where the telephone wire was under the sole possession, control, and maintenance of the United States at the time of the accident. *Id.* at 356, 360–62. The key principle underlying *Wilks* and its progeny is that, where liability is premised on a failure to abate a nuisance, there must be a duty to act. *See* Restatement (Second) of Torts § 824 ("The conduct necessary to make the actor liable for . . . private nuisance may

43

consist of . . . a failure to act under circumstances in which the actor is under a duty to take positive action to . . . abate the . . . invasion of the private interest.").  And where a landowner no longer controls the land at issue and did not create the nuisance in the first instance, there is no such duty.

Here, the Town simply had no ability to "possess the property" containing the alleged nuisance or "control the activities that occur on it."  *Taggart*, 14 N.Y.S.3d at 392.  Thus, it does not matter whether the Town may have been better positioned to undertake a sand bypass project than other entities; New York law is clear that it had no *obligation* to do so.  The mere fact that the Town owned the property underneath the Jetties did not impose upon it a duty to take affirmative steps to remediate the downstream erosion the Jetties may have caused.[14]

---

[14] Plaintiffs also appear to argue that the Town's 1962 "Assurance of Local Cooperation" gave rise to a duty to mitigate the effects of the Jetties because the Town agreed to indemnify the federal government for "claims for damages that may occur from the construction and maintenance of the improvements" to Lake Montauk Harbor as part of the FNP.  App'x at 4605.  But even if this indemnification clause did reach Plaintiffs' private nuisance claims (an issue we do not decide), at most, this would simply require the Town to indemnify the *federal government* if it were found liable for private nuisance.  *Cf. Raquet v. Braun*, 90 N.Y.2d 177, 183 (1997) (explaining the distinction between liability based on a duty running to the injured party and common-law indemnification, which involves "a separate duty owed [to] the indemnitee by the indemnitor").  It would not create a duty running from the Town to the Plaintiffs to mitigate all adverse effects of the Jetties.

Plaintiffs alternatively argue that, even if the Town's mere ownership of the property under the Jetties did not give rise to a duty to mitigate their effects, the Town was still obligated to take action because it had knowledge of and thereby "consented" to the nuisance, and because the Town "continues to derive a benefit from the nuisance." Pls.' Br. at 43 (internal quotation marks omitted).[15] But a landowner's knowledge of or benefit from a nuisance does not give rise to nuisance liability under New York law unless the property owner was aware of or had reason to be aware of the nuisance *at the time it relinquished control of the property*. *See Taggart*, 14. N.Y.S.3d at 392 (granting defendant landowners' motion for summary judgment where the plaintiffs "did not allege that the defendants created the alleged nuisance, or that they knew or had reason to know that the

---

[15] In passing, Plaintiffs argue that the Town "create[d] or participate[d] in the creation or maintenance of the nuisance," on the theory that the Town "function[ed] as the initiator of the [J]etty rehabilitation." Pls.' Br. at 36, 39. However, all of Plaintiffs' cases supporting this theory – most of which involve holding joint tortfeasors liable for *public* nuisance – pertain to defendants who directly participated in the creation of the nuisance, even if their relationship to the ultimate harm was relatively remote. *See, e.g.*, *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 121 (2d Cir. 2013) (rejecting the notion that Exxon was "too remote" from the contamination of a drinking well with MTBE because (1) "Exxon manufactured gasoline containing MTBE and supplied that gasoline to service stations in Queens" and (2) "Exxon knew station owners would store this gasoline in underground tanks that leaked"). By contrast, Plaintiffs point to no cases in which remote, indirect involvement of a defendant with no knowledge of the potential downstream consequences of its actions – such as the Town's advocacy for federal rehabilitation of the Jetties in the 1930s and 40s – qualifies as "creating" a nuisance under New York law.

allegedly objectionable activities would take place at the time that the property was leased to the tenants"); *see also Wilks*, 243 N.Y. at 362; N.Y. Pattern Jury Instructions § 2:116 (Comm. on Pattern Jury Instructions 2019).

Here, Plaintiffs contend that the Town knew that the Jetties were causing erosion as early as 1994 and that the Town benefits from the Jetties because of the accumulation of sand on public beaches to the east of the Jetties and the municipal benefits generated by the harbor. But Plaintiffs presented no evidence at trial indicating that the Town knew or had any reason to believe that the Jetties would cause erosion to the private beaches to the west of the Jetties when the Town relinquished control of the Jetties in 1942. Thus, any awareness that the Town gained about the alleged nuisance *after* that transfer of title did not give rise to a duty to abate that nuisance, *see Taggart*, 14 N.Y.S.3d at 392; *Wilks*, 243 N.Y. at 362, and the district court properly granted judgment as a matter of law to the Town on Plaintiffs' private nuisance claims.[16]

---

[16] We also reject Plaintiffs' argument that the district court erred by deciding the issue of negligent nuisance, despite instructing the jury not to reach that issue if it found the Town liable for intentional private nuisance. With respect to negligent nuisance, the district court correctly concluded that the Town's lack of a legal duty to mitigate the effects of the Jetties precluded such a claim. *See Cangemi IV*, 374 F. Supp. 3d at 237. This was an issue of law that was proper for the district court to decide, and Plaintiffs point to no case law supporting their assertion that this decision somehow "usurped" the jury's function. Pls.' Br. at 52.

46

### b. Trespass

The district court also appropriately granted the Town's renewed motion for judgment as a matter of law on Plaintiffs' trespass claims. Under New York law, a trespass requires that a defendant "intend[] the act which produces the unlawful intrusion" onto another's property, "where the intrusion is an immediate or inevitable consequence of the act." *Volunteer Fire Ass'n of Tappan, Inc. v. County of Rockland*, 956 N.Y.S.2d 102, 105 (2d Dep't 2012). Here, as the district court recognized, "the only action the Town has taken" with respect to the Jetties "was to relinquish control over them." *Cangemi IV*, 374 F. Supp. 3d at 234. Thus, Plaintiffs' only plausible argument that the Town took *action* that caused waters to flow unnaturally onto their property is premised on (1) the Town's advocating for the Lake Montauk Harbor FNP in the 1930s and 40s and (2) the Town's grant of an easement to the federal government in 1942.

But, as already discussed, Plaintiffs presented no evidence at trial suggesting that the Town knew or had any reason to know in 1942 that the Jetty rehabilitation project (which would not be completed for another 26 years) would result in altering the flow of water in such a way as to cause erosion on properties subsequently acquired by Plaintiffs. *See Phillips v. Sun Oil Co.*, 307 N.Y. 328, 331

47

(1954) (holding that a defendant is not liable in trespass for liquids intruding onto another's property "unless [the defendant] had good reason to know or expect that subterranean and other conditions were such that there would be passage from defendant's to plaintiff's land"). The disruption of the flow of water was therefore not "an immediate or inevitable consequence" of the Town's intentional conduct in passing control of the Jetties over to the federal government. *Volunteer Fire Ass'n of Tappan*, 956 N.Y.S.2d at 105.[17]

3.    **The law of the case doctrine did not compel denial of the Town's motion for judgment as a matter of law.**

Finally, Plaintiffs contend that the district court erred by deviating from the "law of the case" when it reversed its prior rulings and granted the Town's Rule 50(b) motion. Plaintiffs argue that, because the district court denied the Town's motion to dismiss Plaintiffs' private nuisance and trespass claims in *Cangemi I* and denied the Town's motion for summary judgment on those claims in *Cangemi III*, it unduly prejudiced Plaintiffs by granting the Town's renewed motion for

---

[17] Because we affirm the district court's grant of the Town's renewed motion for judgment as a matter of law on these grounds, we need not consider the Town's alternative bases for affirming the district court's judgment – *i.e.*, that Plaintiffs' state-law claims are preempted by federal law and that any private nuisance or trespass caused by the Jetties was protected by a prescriptive easement. *See* Town's Br. at 54–59. We likewise need not reach the issue of whether the district court properly granted, in the alternative, the Town's motion for a new trial.

judgment as a matter of law after trial in *Cangemi IV*. *See Colvin v. Keen*, 900 F.3d 63, 69 (2d Cir. 2018) (explaining that a district court abuses its discretion under the law of the case doctrine when it makes "a change of ruling" that "cause[s] prejudice to the appellant"). Plaintiffs' law of the case argument fails for two distinct reasons.

First, the district court's decision in *Cangemi IV* did not directly conflict with its previous decisions in *Cangemi I* and *Cangemi III*. Rather, as the district court explained in *Cangemi IV*, its apparent about-face on Plaintiffs' private nuisance and trespass claims stemmed from the lack of any evidence presented at trial that the Town exercised control over (or even had the ability to exercise control over) the Jetties. *See Cangemi IV*, 374 F. Supp. 3d at 234. The law of the case doctrine cannot bar a district court from holding plaintiffs to their ever-increasing burden of proof over the course of a lawsuit. *See, e.g.*, *Sagendorf-Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996) (concluding that new evidence presented during trial justified the district court's reconsideration of a prior ruling); *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 142 (E.D.N.Y. 2009) (explaining that the law of the case doctrine "is inapposite" to issues that have been developed through discovery

49

"because of the divergent standard of review applicable to motions to dismiss and motions for summary judgment").

Second, even if it could be said that the district court reconsidered its decisions in *Cangemi I* and *III* on purely legal grounds, the law of the case doctrine is "discretionary and does not limit a court's power to reconsider its own decision prior to final judgment." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). While the district court perhaps could have addressed the legal arguments it considered in its 2019 decision at an earlier stage of the case, district courts are by no means obligated to deny a Rule 50 motion simply because earlier in the litigation they denied a motion to dismiss or a motion for summary judgment on the same issue. As we have recently explained, if the law of the case doctrine "were pushed so far as to call upon the reviewing court to vacate a changed, but correct, judgment, solely by reason of the change," the doctrine "would then mean that the initial incorrect ruling would bind not only the court that made it, but also the court of appellate review, whose function is to correct errors, rather than perpetuate them." *Colvin*, 900 F.3d at 72. Simply put, the district court eventually got it right with respect to Plaintiffs' private nuisance and

trespass claims, and it did not abuse its discretion in reconsidering its previous legal conclusions prior to a final judgment.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.