*Blecher v. Holy See*

In the

# United States Court of Appeals

For the Second Circuit

———

August Term, 2023

(Argued: September 13, 2023    Decided: July 24, 2025)

Docket No. 22-2840

———

ERIK BLECHER, JAMES BRUNO, ROBERT BURNS, EMMETT CALDWELL, LOUIS CASTIGLIONE, KEVIN CAVANAUGH, BRIAN COMPASSO, WAYNE COMPASSO, VINCENT DILLARD, JOHN GILLEN, STEPHEN HURN, JOSEPH JOCKEL, MARIANNE AGNELLO, DIANNE MONDELLO, VERNON ALLEN JONES, MICHAEL LEONARD, JOHN O'CONNOR, THOMAS O'CONNOR, DANIEL RICE, JOSEPH RUSSO, TOM SPARKS, PETER SENATORE, MATTHEW SEXTON, LAWRENCE SMITH, JORDAN TAYLOR, DESIREE CALLENDER, JACQUELINE REGAN, MICHAEL GILL, NEIL M. CURTIS, AND ROBERT LISIECKI, ON BEHALF OF THEMSELVES AND ALL PERSONS SIMILARLY SITUATED,

*Plaintiffs-Appellants*,

–v.–

THE HOLY SEE, AKA THE APOSTOLIC SEE,

*Defendant-Appellee.*\*

———

———

\* The Clerk of Court is directed to amend the official caption as set forth above.

Before:

RAGGI, LOHIER, and CARNEY, *Circuit Judges*.

---

The question presented in this case is whether the discretionary function exclusion from the tortious activity exception of the Foreign Sovereign Immunities Act ("FSIA") precludes federal courts from exercising jurisdiction over claims against the Holy See concerning child sexual abuse perpetrated by clerics in the United States. Plaintiffs-Appellants are thirty survivors of childhood sexual abuse who seek damages for negligence from Defendant-Appellee the Holy See under a vicarious liability theory. They allege that the Holy See promulgated a mandatory policy of secrecy that governed how its dioceses and bishops handled reports of sexual abuse by clerics. In adhering to this policy, Plaintiffs allege, bishops in New York—the Holy See's employees—failed to warn children and parents of the dangers posed by the accused clerics and failed to report suspected abuse to law enforcement, thus emboldening abusers and exposing children to a foreseeable risk of harm. The District Court (Oetken, *J.*) granted the Holy See's motion to dismiss for lack of subject matter jurisdiction under the FSIA, concluding that the discretionary function exclusion from the FSIA's tortious activity exception barred Plaintiffs' claims. On *de novo* review, we agree with the District Court. Accordingly, we AFFIRM the District Court's judgment dismissing the action for lack of jurisdiction.

---

JEFFREY HERMAN (Stuart S. Mermelstein, *on the brief*), Herman Law Firm, Boca Raton, FL, *for Plaintiffs-Appellants.*

ALEXIS HALLER, Law Office of Alexis Haller, Aptos, CA (Jeffrey S. Lena, Law Office of Jeffrey S. Lena, Berkeley, CA; Jennifer L. Bruno, Soquel, CA, *on the brief*), *for Defendant-Appellee.*

---

CARNEY, *Circuit Judge*:

The question presented in this case is whether the discretionary function

exclusion from the tortious activity exception of the Foreign Sovereign Immunities Act

("FSIA") precludes federal courts from exercising jurisdiction over claims against the

Holy See concerning child sexual abuse perpetrated by clerics. Plaintiffs-Appellants are thirty survivors of childhood sexual abuse who seek damages for negligence from Defendant-Appellee the Holy See under a vicarious liability theory. They allege that the Holy See promulgated a mandatory policy of secrecy that governed how its dioceses and bishops handled reports of sexual abuse by clerics. In adhering to this policy, Plaintiffs allege, bishops in the Archdiocese of New York, the Diocese of Brooklyn, the Diocese of Rockville Centre, the Diocese of Albany, the Diocese of Syracuse, and the Diocese of Ogdensburg (together, the "New York dioceses") failed to warn children and parents of the dangers posed by the accused clerics and failed to report suspected abuse to law enforcement, thus emboldening abusers and enabling abuse to continue for years. The District Court (Oetken, *J.*) granted the Holy See's motion to dismiss for lack of subject matter jurisdiction under the FSIA, concluding that the discretionary function exclusion from the FSIA's tortious activity exception barred Plaintiffs' claims. Because we agree with the District Court that the discretionary function exclusion applies and precludes Plaintiffs' claims, we **AFFIRM** its judgment dismissing the action for lack of jurisdiction.

## BACKGROUND

### I. Overview of the FSIA

Before the FSIA was enacted in 1976, "[f]or more than a century and a half, the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). As the Supreme Court has observed, "foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Id.* The Court therefore tended to defer to the decisions of the Executive Branch on whether to exercise jurisdiction over actions against foreign sovereigns. *See id.*

But in 1952, the State Department issued the "Tate Letter." *See* Ltr. from Jack B. Tate, Acting Legal Adviser, Dep't of State, to Acting Att'y Gen. Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dep't State Bull. 984–85 (1952). The Tate Letter was "a landmark policy statement expressing the Executive Branch's adoption of a more nuanced, 'restrictive theory' of sovereign immunity, under which sovereigns would enjoy immunity as to their public acts, but not as to their private or commercial activities outside of their territories." *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 103 (2d Cir. 2017). Despite this lucid statement, the State Department continued to make immunity determinations on a case-by-case basis, "suggest[ing] . . . immunity in cases where immunity would not have been available under the restrictive theory," *Verlinden*, 461 U.S. at 487, and contributing to a "patchwork quilt of immunity decisions," *Mobil Cerro Negro*, 863 F.3d at 103.

In response to the growing disarray, in 1976 Congress passed the FSIA. *See* 28 U.S.C. §§ 1330, 1332(a)(2)–(4), 1391(f), 1441(d), 1602–1611. The FSIA codified the restrictive theory of foreign sovereign immunity and "vested responsibility for immunity determinations in the federal judiciary." *Mobil Cerro Negro*, 863 F.3d at 104 (citing *Verlinden*, 461 U.S. at 488–89). The FSIA provides the "sole basis" for the exercise of jurisdiction over a foreign sovereign in U.S. courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the FSIA, a "foreign state" is presumptively immune from the jurisdiction of courts in this country unless an express exception to immunity found in the FSIA applies. 28 U.S.C. § 1604.[1] *See Republic of*

---

[1] Section 1604 provides: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604.

*Hungary v. Simon*, 145 S. Ct. 480, 488 (2025); *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

One of the statutory exceptions to immunity established by the FSIA is the tortious activity exception. 28 U.S.C. § 1605(a)(5). It permits courts to exercise jurisdiction over claims against foreign sovereigns "in which money damages are sought against a foreign state for personal injury or death, . . . occurring in the United States and caused by the tortious act or omission of [the] foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." *Id*. To satisfy the exception's situs requirement, "the 'entire tort' must be committed in the United States." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 115 (2d Cir. 2013).

The statute also provides an "exception to the exception," however: this is the "discretionary function exclusion" from the tortious activity exception, which is set forth in 28 U.S.C. § 1605(a)(5)(A). *USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 111 (2d Cir. 2012). The discretionary function exclusion "preserves the immunity of a sovereign nation when it would otherwise be abrogated by the tortious activity exception." *Id.* It holds that the tortious activity exception does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A).[2] Thus, the FSIA generally excepts a sovereign's tortious acts in the United States from jurisdictional immunity in the courts, but

[2] For completeness: The FSIA contains a separate jurisdictional exclusion from the tortious activity exception for "any claim arising out of out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 1605(a)(5)(B).

reinstates the immunity where the claim turns on the sovereign's discretionary act—the "exclusion" from the "exception."

The Supreme Court has yet to interpret the discretionary function exclusion of the FSIA, but it has evaluated the corresponding exception in the Federal Tort Claims Act ("FTCA").[3] Because the language of the FSIA exclusion is "closely replicated" in the FTCA, we regularly consult FTCA caselaw when analyzing the exclusion in the FSIA context. *Swarna v. Al-Awadi*, 622 F.3d 123, 145 (2d Cir. 2010); *see also USAA*, 681 F.3d at 112 n.43 (looking to FTCA caselaw in FSIA case). Indeed, in its discussion of the exclusion, the 1976 House Report accompanying the FSIA expressly refers to the FTCA. *See* H.R. Rep. No. 94-1487, at 21 (1976) ("The exception[] provided in subparagraph[] (A) . . . of section 1605(a)(5) correspond[s] to many of the claims with respect to which the U.S. Government retains immunity under the Federal Tort Claims Act, 28 U.S.C. [§] 2680(a) . . . .").

---

[3] The corresponding language in the FTCA, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, waives the sovereign immunity of the federal government from suits for negligent or wrongful acts of its employees (subject to many exceptions). It further provides that the FTCA's waiver of immunity does not apply to:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or *based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused*.

*Id.* § 2680(a) (emphasis added). The first half of this provision sets forth the FTCA's "due care exception," which is designed to "bar[] tests by tort action of the legality of statutes and regulations." *Dalehite v. United States*, 346 U.S. 15, 33 (1953). The due care exception does not appear in the corresponding general provision of the FSIA, 28 U.S.C. § 1605(a)(5), and is not at issue here. The second half of section 2680(a) sets forth the FTCA's discretionary function exception. As observed above, it contains language virtually identical to that contained in the FSIA's discretionary function exclusion.

The Supreme Court has established a two-pronged framework known as the "*Berkovitz/Gaubert* test" for determining whether the discretionary function exception applies in the FTCA context. *See Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988); *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991). Under this test, the FTCA discretionary function exception bars the exercise of jurisdiction over a claim where (1) the challenged act or omission is "discretionary," meaning that it "involves an element of judgment or choice," *Berkovitz*, 486 U.S. at 536; and (2) the judgment or choice in question is grounded in "considerations of public policy" or is "susceptible to policy analysis," *Gaubert*, 499 U.S. at 323, 325 (internal quotation marks omitted).[4] Put differently, the FTCA's discretionary function exception permits the exercise of jurisdiction if a plaintiff can show: "*either* (1) the United States' allegedly tortious act (or failure to act) was inconsistent with a 'specific mandatory directive' – *i.e.*, a 'federal statute, regulation, or policy that specifically prescribes a course of action for the federal government to follow,' . . . *or* (2) the allegedly tortious 'judgment or choice in question' is not 'grounded in considerations of public policy or susceptible to policy analysis.'" *Cangemi v. United States*, 13 F.4th 115, 130 (2d Cir. 2021) (emphases in original)

---

[4] In explaining the interrelationship between the first and second prongs of the *Berkovitz/Gaubert* test, the Supreme Court summarized:

> [I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

*Gaubert*, 499 U.S. at 324 (citation omitted).

(alterations adopted) (quoting *Berkovitz*, 486 U.S. at 536, 544, and *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000)).

"Plaintiffs bear the initial burden to state a claim that is not barred by the [FTCA discretionary function exception]." *Molchatsky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013); *City of New York v. Permanent Mission of India to the United Nations*, 446 F.3d 365, 369 (2d Cir. 2006) ("The party seeking to establish jurisdiction bears the burden of producing evidence establishing that a specific exception to immunity applies, but the foreign state then bears the ultimate burden of persuasion on this question."), *aff'd and remanded*, 551 U.S. 193 (2007).

We have applied the *Berkovitz/Gaubert* test in the FSIA context. *See, e.g.*, *USAA*, 681 F.3d at 111–12 (setting out test in FSIA case). With these principles in mind, we turn to Plaintiffs' contentions.[5]

---

[5] We recognize that the subtle distinction in terms between the FTCA's "discretionary function *exception*" and the FSIA's "discretionary function *exclusion*" may appear confusing to a casual reader. In short, these differing terms reflect the fact that the FTCA and FSIA operate from different baselines. The FTCA generally waives the sovereign immunity of the United States federal government from suits for negligent or wrongful acts of its employees (subject to many *exceptions*, including the discretionary function exception). The FSIA, by contrast, establishes the foreign sovereign's immunity from suit, unless an FSIA statutory exception, like the "tortious activity exception," applies. 28 U.S.C. § 1605(a)(5). The FSIA's discretionary function exclusion is an exception to the tortious activity exception to the foreign sovereign's presumptive immunity: if the discretionary function exclusion applies, the foreign government's immunity is preserved "when it would otherwise be abrogated by the tortious activity exception." *USAA*, 681 F.3d at 111. Accordingly, we use "exclusion" when referring to the FSIA's discretionary function exclusion and "exception" when referring to the FTCA's discretionary function exception. When correctly applied, the exclusion and exception each bar the exercise of jurisdiction over an action against the relevant sovereign.

## II. Factual Background[6]

Plaintiffs allege that they were abused in the 1960s through 1990s by named clerics of the New York dioceses. Asserting negligence claims under a vicarious liability theory, they seek damages from the Holy See for the physical and psychological injuries they allegedly sustained from the abuse.

The Holy See directs the activities of the organizations, agents, and employees of the Catholic Church worldwide.[7] The Church divides itself into geographic territories comprising dioceses and archdioceses (in effect, a large diocese). Bishops operate dioceses; an archdiocese is a "primary diocese" in a region, governed by an archbishop. Am. Compl. ¶ 46, Plaintiffs' App'x ("App'x") at 32. An archbishop enjoys a "position of honor" among bishops, but operates in parallel to—that is, exercises no direct authority over—bishops. *Id.* Bishops and archbishops (together, "bishops") conduct the Church's activities at a local level, supervising priests and all other clerics assigned to work within their respective dioceses and archdioceses. The bishops perform these duties "under the direction and complete, plenary control of the Holy See." *Id.* The Complaint alleges that bishops in the U.S. are employees of the Holy See.

Central to Plaintiffs' theory of the case is the mandatory secrecy policy allegedly established by the Holy See about one hundred years ago in a confidential document

---

[6] Unless otherwise noted, the allegations set forth below are drawn from Plaintiffs' amended complaint (the "Complaint").

[7] The Holy See is the "universal government of the Catholic Church and operates from Vatican City State, a sovereign, independent territory." *See* U.S. Dep't of State, *U.S. Embassy, The Vatican*, https://diplomacy.state.gov/encyclopedia/u-s-embassy-the-vatican [https://perma.cc/Y2N7-9JUF] (last accessed July 21, 2025). Courts treat the Holy See as a "foreign state" for FSIA purposes. *See, e.g., O'Bryan v. Holy See*, 556 F.3d 361, 372–74 (6th Cir. 2009). The parties do not dispute that the Holy See is a "foreign state" within the meaning of the FSIA, and we proceed on that understanding.

titled "Instruction on the Manner of Proceeding in Cases of Solicitation" or "*Crimen Sollicitationis*" ("the Policy"). *Id.* ¶ 65, App'x at 37. Initially promulgated in 1922 and reiterated in documents issued in 1962, 2001, and 2010, the Policy established, as pertinent here, specific internal procedures for investigating and responding to allegations and reports of child sexual abuse within the Catholic Church. *Id.* ¶¶ 65, 69, App'x at 37–39. It imposed a requirement of "strict secrecy" outside of these specified processes, under penalty of excommunication. *Id.* ¶ 64, App'x at 37. In particular, as alleged here, the Policy mandated that bishops: not disclose allegations of abuse to law enforcement; instruct victims and their families not to report incidents of abuse to law enforcement; and provide no warning or disclosure, such as might otherwise help protect parishioners from abuse. According to Plaintiffs, the Policy "emboldened sexual predators among [the] clergy," created an environment in which predators "could engage in child sexual abuse with impunity," and placed children in the dioceses at foreseeable risk of harm. *Id.* ¶ 79, App'x at 41–42.

### III.   Procedural History

Plaintiffs filed this putative class action against the Holy See in May 2020. In July 2021, the Holy See moved to dismiss the action for lack of subject matter jurisdiction, lack of personal jurisdiction, improper venue, and failure to state a claim. Plaintiffs then filed an amended complaint—the complaint at issue here. The Holy See again moved to dismiss for, among other things, lack of subject matter jurisdiction. And in September 2022, the District Court granted the Holy See's motion, concluding that the District Court lacked subject matter jurisdiction under the FSIA over Plaintiffs' suit. It reasoned as follows.

As to Plaintiffs' claims based on the allegedly tortious conduct of the New York dioceses, the District Court concluded that the dioceses, which are New York

10

corporations organized under New York law, each have a separate juridical status from that of the foreign sovereign, the Holy See. *See Blecher v. Holy See*, 631 F. Supp. 3d 163, 168–70 (S.D.N.Y. 2022). It determined that Plaintiffs failed to allege facts sufficient to overcome the "strong presumption" established by the Supreme Court in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983), that, as an instrumentality of a foreign state, the Holy See has a status independent from that of the foreign state itself. *Blecher*, 631 F. Supp. 3d at 169–70 (quoting *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 56 (2d Cir. 2021)). This conclusion in effect made the Holy See the wrong defendant on Plaintiffs' claims based on the dioceses' and bishops' actions.

The District Court then rejected Plaintiffs' argument in the alternative that common-law agency principles should apply to overcome the *Bancec* presumption. Even if the New York dioceses could be considered "agents" of the Holy See, it explained, the tortious activity exception's "plain language extends only to tortious conduct either by the 'foreign state' or its 'official or employee,'" not to agents of the foreign state. *Id.* at 170 (quoting 28 U.S.C. § 1605(a)(5)). It thus determined that, under the FSIA, the Holy See could not be held vicariously liable for the dioceses' allegedly tortious conduct. *See id.* at 168–70.

The District Court then turned to Plaintiffs' claims based on the allegedly tortious conduct of the individual bishops who administered the New York dioceses. It ruled that the bishops were employees of the Holy See under New York law; that in reporting or failing to report the accusations, the bishops were acting within the scope of their employment; and that the Holy See could therefore, as a general matter, be held vicariously liable for the bishops' (as opposed to the dioceses') alleged conduct. *See id.* at 170–72. Next, the court concluded that Plaintiffs satisfied the "entire tort"

11

requirement of the FSIA's tortious activity exception,[8] reasoning that Plaintiffs' core theory of the case was premised on the bishops' *local* implementation of the Holy See's secrecy policy—that is, the bishops' conduct in allegedly failing to warn parishioners about and to report suspected or actual abuse by clerics in their dioceses in the United States. *See id.* at 172. It then found that the Complaint "contain[ed] ample well-pleaded allegations of alleged sexual abuse traceable to the alleged negligence of supervising clergy and the Archbishop." *Id.* Accordingly, the District Court concluded, the tortious activity exception covered Plaintiffs' claims with respect to the bishops. *See id.*

But the District Court then decided that the court's exercise of jurisdiction over Plaintiffs' claims based on the bishops' alleged conduct was nonetheless barred by the discretionary function exclusion from the tortious activity exception. *Id.* at 172–74. In so concluding, it first determined that the bishops' challenged conduct was discretionary, saying that "the Supreme Court has been clear that promulgation of a policy or regulation by employees is *discretionary in nature*." *Id.* at 173 (emphasis in original) (citing *Gaubert*, 499 U.S. at 323). It relied in part on the Supreme Court's instruction, in the analogous FTCA context, that "if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Id.* (quoting *Gaubert*, 499 U.S. at 324). It also explained: "[C]ommon sense dictates that there are many ways to minister to parishes and to run a diocese," and "within that mosaic, the individual bishops . . . appear to have some discretion in how to deal with priests under their supervision . . . ." *Id.* (internal quotation marks omitted).

---

[8] Recall that the "entire tort" must be committed in the United States to be covered by the tortious activity exception. 28 U.S.C. § 1605(a)(5); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 115.

The District Court next found that the bishops' decision "whether to warn about an individual's dangerous proclivities is the type of discretionary judgment that the exclusion was designed to protect." *Id.* (internal quotation marks omitted and alterations adopted). Accordingly, it concluded, any alleged decision by the Holy See's employees—the bishops—about whether to warn or report was susceptible to policy analysis and therefore covered by the discretionary function exclusion. *See id.* at 173–74.

The District Court entered judgment granting the Holy See's motion to dismiss for lack of subject matter jurisdiction under the FSIA. Plaintiffs timely appealed.

## DISCUSSION

We review *de novo* the District Court's legal conclusions "regarding jurisdiction under the FSIA." *USAA*, 681 F.3d at 107 (internal quotation marks omitted). When considering a motion to dismiss for lack of subject matter jurisdiction, "we must accept as true all material factual allegations in the complaint," but we may not draw any jurisdictional inferences in favor of the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004); *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ("[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.").

"[T]o determine whether one of the exceptions to the FSIA's general exclusion of jurisdiction over foreign sovereigns applies," the court "must review the pleadings and any evidence before it." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (internal quotation marks and citation omitted); *id.* at 141 n.6 ("A district court may consult evidence to decide a Rule 12(b)(1) motion . . . [and] must do so if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction." (internal quotation marks omitted)); *J.S. ex rel. N.S.*, 386 F.3d at 110 ("We may consider affidavits and other materials beyond the pleadings to resolve the

13

jurisdictional issue, but we may not rely on conclusory or hearsay statements contained in the affidavits."). In particular, "under the FSIA, the district court may examine the defendant's activities to determine whether they confer subject matter jurisdiction on the federal courts." *Robinson*, 269 F.3d at 141–42.

**I.     Jurisdiction over Plaintiffs' claims against the Holy See is barred by the discretionary function exclusion from the tortious activity exception in the FSIA.**

On appeal, Plaintiffs submit that the District Court erred in concluding that their claims—alleging that the bishops engaged in tortious conduct when they carried out the Holy See's mandatory secrecy policy—fall within the discretionary function exclusion from the FSIA's tortious activity exception.[9] We disagree.

> **A.     The bishops' challenged conduct involved discretionary acts, and Plaintiffs fail to allege that the bishops' conduct violated a mandatory policy, so *Berkovitz/Gaubert* prong one is satisfied.**

According to Plaintiffs, the District Court improperly applied the discretionary function exclusion because, they assert, the Complaint plausibly alleges tortious conduct that involved no discretion by the bishops. Moreover, because the bishops' conduct was purportedly compelled by the Holy See's mandatory secrecy policy, Plaintiffs argue that their claims necessarily fall outside the ambit of the exclusion for the purposes of *Berkovitz/Gaubert* prong one.[10] Plaintiffs' arguments fall short. We address each in turn.

_____

[9] On appeal, Plaintiffs do not challenge the District Court's ruling that, under the FSIA, the Holy See could not be held vicariously liable for the New York dioceses' allegedly tortious conduct. Plaintiffs' Br. at 10 n.9; *see Blecher*, 631 F. Supp. 3d at 168–70.

[10] On appeal, the Holy See argues that the District Court erred in concluding that the tortious activity exception applied in the first place. Specifically, it challenges the District Court's conclusions that Plaintiffs' allegations met the "entire tort" requirement, and that the Complaint

*1. The bishops' challenged conduct involved discretionary acts.*

Despite Plaintiffs' conclusory allegations that the bishops' compliance with the Policy left them with no room for discretion, Plaintiffs' theory of causation, as alleged in the Complaint, depends on discretionary actions by bishops. Plaintiffs allege that they were all abused by priests or deacons who were "assigned" to Plaintiffs' respective parishes, churches, or schools. Am. Compl. ¶¶ 4–12, 14–28, 30–36, App'x at 20–29. This assignment authority is crucial to Plaintiffs' theory of causation. The alleged harm flows not merely from failing to warn about known dangers but also from the decisions to assign clergy to positions where they could access potential victims while maintaining the alleged secrecy about past misconduct. As Plaintiffs have repeatedly clarified in their submissions to the Court (but outside the four corners of their Complaint), these priests and deacons were all "assigned by an Archbishop or Bishop to the respective parishes where they abused children." Plaintiffs' Reply Br. at 24 (citing Am. Compl. ¶¶ 34–36, App'x at 30); Plaintiffs' Mem. in Opp'n to Mot. to Dismiss, Dist. Ct. Dkt. No. 55 at 31 ("[T]he clergy perpetrators *assigned to the parishes by the bishops* were placed in particular positions that enabled them to groom and sexually abuse Plaintiffs." (citing Am. Compl. ¶¶ 4, 7, 12, 19, 22, 28–33, App'x at 20–29) (emphasis added)); *id*. at 22 ("These clergymen were each assigned by the Archbishop of New York to the parishes where they abused Plaintiffs." (citing Am. Compl. ¶ 34, App'x at 30)); *see also* Am. Compl. ¶ 58, App'x at 35 ("A Bishop is the superior of all Priests and other clergy assigned to work within his Diocese."); Plaintiffs' Br. at 6 ("The Bishops were designated by the Holy See as the direct supervisors of the clergy assigned within their

---

sufficiently alleged a causal link between the employees' challenged conduct and the harm suffered by Plaintiffs. Holy See Br. at 47–57; *see Blecher*, 631 F. Supp. 3d at 172. Because we affirm the judgment of the District Court on the ground that the discretionary function exclusion from the tortious activity exception precludes the exercise of jurisdiction, we do not reach these arguments.

respective territories, subject to the directives of the Holy See.”). At oral argument, Plaintiffs' counsel explained how, in their view, the Policy and the bishops' assignment authority combined enabled abuse, stating that a bishop's alleged silence “enabled this priest to molest again, or they moved him, as part of the silence, they moved him to another church where he then molests again.” Oral Argument Tr. at 28:8–10.[11]

The bishops' “[d]ay-to-day management” decisions regarding how and where to assign clergy is a quintessentially discretionary act, “requir[ing] judgment as to which of a range of permissible courses is the wisest.” *Gaubert*, 499 U.S. at 325; *see Swarna*, 622 F.3d at 146 (“[Plaintiff's] claim that Kuwait failed to institute procedures or a system to monitor its employees implicates a discretionary function [under the FSIA].”); *Blaber v. United States*, 332 F.2d 629, 631 (2d Cir. 1964) (holding that decisions concerning extent of supervision of private contractors fell within FTCA discretionary function exception); *M.D.C.G. v. United States*, 956 F.3d 762, 772 (5th Cir. 2020) (holding that supervision of subordinates involved element of choice and thus fell within FTCA discretionary function exception); *Suter v. United States*, 441 F.3d 306, 313 n.6 (4th Cir. 2006) (“Courts have repeatedly held that government employers' hiring and supervisory decisions are discretionary functions.”); *Sharp ex rel. Est. of Sharp v. United States*, 401 F.3d 440, 447 (6th Cir. 2005) (holding that National Forest Service staffing allocation decisions fell within FTCA discretionary function exception); *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) (holding that staffing allocation fell within discretionary function exception to the FTCA); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207,

---

[11] The Holy See submitted evidence to the District Court consistent with these assertions. *See, e.g.*, Decl. of Professor Andrea Bettetini (2022), Dist. Ct. Dkt. No. 63 ¶¶ 27, 41, 43, Supplemental App'x at 55–56, 66–67 (discussing authority of bishops); Decl. of Professor Andrea Bettetini (2021), Dist. Ct. Dkt. No. 47 ¶ 18, App'x at 64–65 (same); Dist. Ct. Dkt. No. 64-20, Supplemental App'x at 113 (testimony of Plaintiffs' expert, Rev. Doyle) (“[T]he bishop himself would decide . . . [whether] the individual was transferred to another assignment in the same diocese or in another country or another diocese where inevitably he would continue to offend.”).

1217 (D.C. Cir. 1997) ("[D]ecisions concerning the hiring, training, and supervising of [Washington Metropolitan Area Transit Authority] employees are discretionary in nature.").

Taking Plaintiffs' allegations as true, the Policy left no room for discretion that would enable bishops to, *inter alia*, "disclos[e] or report[] to persons serving in the Catholic schools and parishes that a *clergyman assigned there* was known or suspected of child sexual abuse, or was at risk of engaging in such conduct." Am. Compl. ¶¶ 112, 121, 130, App'x at 49, 51, 52–53 (emphasis added). Yet, the alleged breach of the bishops' duty to "disclos[e] or report" is premised on the discretionary assignment of clergy within the bishops' territory. *Id*. Accordingly, the harms that Plaintiffs allege hinge on the discretionary acts of bishops in assigning clergy to positions within the dioceses that enabled abuse.[12] Based on their own account, Plaintiffs would not have been harmed but for discretionary acts by bishops. Therefore, Plaintiffs fail to allege that the tortious acts at issue were *not* discretionary, and *Berkovitz/Gaubert* prong one is satisfied.

---

[12] The District Court remarked, in passing, that "common sense dictates that there are many ways to minister to parishes and to run a diocese," and that "within that mosaic, the individual bishops and cardinals appear to have some discretion in how to deal with priests under their supervision . . . ." *Blecher*, 631 F. Supp. 3d at 173 (internal quotation marks omitted). Likewise, the Holy See argues on appeal that "both [the Policy] and common sense show that bishops retained ample discretion in such cases [of clergy sex abuse]." Holy See Br. at 33. As discussed above, we need not rely on common sense nor must we interpret the contours of the Policy itself to identify discretionary acts here. We therefore decline to address the Holy See's contention further. Moreover, it is "well settled" that we "may affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 (2d Cir. 2014) (internal quotation marks omitted). That the district court's reasoning does not mirror ours thus does not prevent us from affirming the judgment.

17

*2. Plaintiffs fail to allege that the bishops' conduct violated a mandatory policy.*

Plaintiffs argue that the discretionary function exclusion does not bar their claims on the ground that the tortious conduct they allege arose from the bishops' compliance with the Holy See's mandatory policy. Plaintiffs' Br. at 13 ("The fact that the tort claim is plausibly alleged to be based on a mandatory regulation or requirement of the foreign state forecloses application of the discretionary function exception and ends the inquiry."). Plaintiffs do not assert that the bishops *violated* the mandatory secrecy policy set forth by the Holy See in any way. But, in light of the Supreme Court's pronouncements in the analogous FTCA context and the comity rationale underlying the FSIA, Plaintiffs' argument ultimately falls short.

In the FTCA context, the Supreme Court has instructed that "if a regulation mandates particular conduct, and the employee *obeys* the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324 (emphasis added). The Court presaged this rule in *Dalehite v. United States*, where it wrote, "[A]cts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of [section] 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion." 346 U.S. 15, 36 (1953).

In contending that their claims against the Holy See based on the bishops' conduct are not barred by the discretionary function exclusion, Plaintiffs rely principally on the argument that "material language in the FTCA is missing from the FSIA," the omission signaling a substantive difference. Plaintiffs' Br. at 16 (capitalization altered). In particular, they argue that the FTCA's "due care exception"— the first phrase of section 2680(a), *see supra* n.3, which preserves the government's

immunity for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid," 28 U.S.C. § 2680(a)[13] — "has no corollary in the FSIA." Plaintiffs' Br. at 17. Plaintiffs posit that the rule articulated by the Supreme Court in *Gaubert* — that "if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected," 499 U.S. at 324 — relied on the FTCA's due care exception and that because no equivalent appears in the FSIA, that rule does not apply in the FSIA context. Therefore, they maintain, the Holy See cannot avail itself of the discretionary function exclusion here.

The fatal flaw in Plaintiffs' argument is that *Gaubert* itself, like the cases it relied on, was about the FTCA's *discretionary function exception*, not the due care exception. *See id.* at 318–19 ("The question before us is whether certain actions taken by [two agencies] are within the 'discretionary function' exception to the liability of the United States under the FTCA."). The *Gaubert* Court ruled that a government employee's conduct in complying with a mandatory directive "will be protected," *id*. at 324, expanding on three applicable precedents, all of which expressly turned on the discretionary function exception and not the due care exception. *See Dalehite*, 346 U.S. at 32–33 (observing that "there are two phrases [in section 2680(a)] describing the excepted acts of government employees," and that the first phrase is the due care exception, while "[t]he second [the discretionary function exception] *is applicable in this case*" (emphasis added)); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* ("*Varig Airlines*"), 467 U.S. 797, 820 (1984) (concluding that acts of agency employees executing a program "in accordance

---

[13] The "due care" exception to the FTCA's abrogation of sovereign immunity "deals with acts or omissions of government employees, exercising due care in carrying out statutes or regulations whether valid or not," and "bars tests by tort action of the legality of statutes and regulations." *Dalehite*, 346 U.S. at 33.

with agency directives are protected by the *discretionary function exception*" (emphasis added)); *Berkovitz*, 486 U.S. at 535 (discussing the discretionary function exception as "[t]he exception relevant to this case").

In particular, *Gaubert*'s reliance on *Dalehite* is instructive. *Dalehite* involved alleged negligence in the government's manufacture, packaging, and preparation of fertilizer for export, resulting in an explosion. The Supreme Court held that the manufacture of the fertilizer was done "in accordance with, and done under, specifications and directions as to how the [Fertilizer Grade Ammonium Nitrate] was produced at the plants," based on an agency plan "developed at a high level under a direct delegation of plan-making authority from the apex of the Executive Department." 346 U.S. at 38, 40. The government employees' actions in compliance with that plan were, therefore, the "product of an exercise of judgment, requiring consideration of a vast spectrum of factors, including some which touched directly the feasibility of the fertilizer export program." *Id*. at 40. Accordingly, the allegedly tortious acts fell "within the exception for acts of discretion." *Id*. at 41. The Court concluded that "acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." *Id*. at 36.[14]

*Berkovitz* involved FTCA claims alleging that the Division of Biologic Standards and the Bureau of Biologics of the Food and Drug Administration failed properly to approve and inspect polio vaccines, *in violation of federal law and policy*. 486 U.S. at 533. The *Berkovitz* Court held that "the discretionary function exception does not apply" to a claim alleging "a failure on the part of the agency to perform its clear duty under

---

[14] Similarly, the Supreme Court in *Dalehite* cited with approval a case applying the discretionary function exception to government blasting operations that were "conducted pursuant to detailed plans and specifications drawn by the Chief of Engineers." 346 U.S. at 36 n.32 (citing *Boyce v. United States*, 93 F. Supp. 866 (S.D. Iowa 1950)).

federal law" because "failing to act in accord with a specific mandatory directive" is not a permissible exercise of discretion. *Id*. at 544.

*Berkovitz* did not involve any claim arising from *compliance* with the law. Yet, Plaintiffs rely on broad language from *Berkovitz* for the doubtful proposition that "[t]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," 486 U.S. at 536, regardless of whether the challenged acts or omissions allegedly comply with or deviate from a prescribed course of action. Plaintiffs' Br. at 20, 22–23. As Plaintiffs correctly note, this Court has previously suggested that *Berkovitz/Gaubert* prong one requires that "the acts alleged to be negligent . . . be discretionary, in that they involve an element of judgment or choice *and are not compelled by statute or regulation*." *Coulthurst*, 214 F.3d at 109 (emphasis added) (internal quotation marks omitted); *accord USAA*, 681 F.3d at 111 (same, in FSIA context) (quoting *Coulthurst*, 214 F.3d at 109). But this Court has never held that a sovereign's immunity was abrogated by allegations of tortious acts purportedly "compelled by statute or regulation"—what Plaintiffs are asking us to conclude here. Rather, our decisions have consistently reflected the premise that to be "discretionary" for purposes of *Berkovitz/Gaubert* prong one, an act must be *not prohibited by* statute or regulation. *See, e.g., Cangemi*, 13 F.4th at 130 (reasoning that acts are non-discretionary when "inconsistent with a 'specific mandatory directive'" (quoting *Berkovitz*, 486 U.S. at 544)); *Fazi v. United States*, 935 F.2d 535, 538 (2d Cir. 1991) ("When the claim is that the injury was caused by a failure to comply with a regulation that 'specifically prescribes a course of action for an employee to follow,' the discretionary function exception does not bar the claim." (quoting *Berkovitz*, 486 U.S. at 536)); *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975) (holding FTCA's discretionary function exception did not apply where plaintiffs alleged "Postal Service has acted in contravention of its own regulations,"

reasoning that "[i]t is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority"). Applying *Berkovitz* in the FSIA context, we have held that, where an alleged failure of the Permanent Mission of the Republic of Namibia to the United Nations to ensure the integrity of a wall constituted a *violation* of a mandatory regulation, "the Mission [could not] avail itself of the protection of the FSIA's discretionary function exception." *USAA*, 681 F.3d at 113.

The interpretation of *Berkovitz* urged by Plaintiffs—that the discretionary function exclusion cannot apply whenever a specific legal directive exists, regardless of whether that directive is followed—is contrary to the Supreme Court's unanimous ruling in *Gaubert*, reached just three years after *Berkovitz*. In *Gaubert*, the Supreme Court explained that the FTCA's discretionary function exception did not apply to bar Berkovitz's claims *not* because there existed a legally prescribed course of action, but because "the agency employees [in *Berkovitz*] had failed to follow the specific directions contained in the applicable regulations, *i.e.*, in those instances, there was no room for choice or judgment." 499 U.S. at 324. It was in this context that the *Gaubert* Court articulated the rule that "if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected[.]" *Id*.

Accordingly, we conclude that this rule—that the FTCA's discretionary function exception bars the exercise of jurisdiction over claims stemming from employee conduct in compliance with a mandatory policy—also applies in the FSIA context to claims against a foreign sovereign. The discretionary function exclusion from the FSIA's tortious activity exception bars the exercise of jurisdiction over claims that challenge employees' compliance with a foreign sovereign's mandatory policy, at least for purposes of *Berkovitz/Gaubert* prong one.

Such a rule makes sense in light of the concerns animating Congress in crafting of the FTCA's discretionary function exception. As the Supreme Court has pointed out, "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig Airlines*, 467 U.S. at 814; *see also id.* at 820 ("Judicial intervention in [agency] decisionmaking through private tort suits would require the courts to 'second-guess' the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent."). "By fashioning an exception for discretionary governmental functions," the Court added, "Congress took steps to protect the Government from liability that would seriously handicap efficient government operations." *Id.* at 814 (internal quotation marks omitted). Because "[c]ases construing the discretionary function exc[lusion] in the FSIA draw heavily on case law interpreting a similar exception in the FTCA," *USAA*, 681 F.3d at 112 n.43, these same considerations have significant purchase in the FSIA context as well. If Congress was reluctant to encourage judicial second-guessing of the federal government's policymaking judgments, we doubt that it was more eager to empower courts to scrutinize the policy decisions of foreign sovereigns.

True, the reasons stated by Congress for crafting the FSIA exclusion do not exactly mirror those expressed when it fashioned the FTCA exception. *See* Restatement (Fourth) of the Foreign Relations Law of the U.S. § 457 (Am. L. Inst. 2018) ("[T]he underlying rationale for the [FSIA discretionary function] exclusion (protecting the dignity of foreign states, respecting the sensitivity of foreign relations, and preserving the sovereign interests of the United States in reciprocal situations) is quite different from the separation-of-powers principle reflected in the FTCA."); *cf. Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003) (explaining that foreign sovereign immunity was

23

intended "to give foreign states . . . some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns"). And, to be sure, some difficulties and ambiguities arise from too readily importing FTCA caselaw into the FSIA context. For example, courts have differed as to whether, in determining if a foreign sovereign's employee was afforded meaningful discretion, the court's proper reference point should be the foreign state's law, international law, domestic U.S. law, or some combination of these.[15] We need not resolve that question here, however, as Plaintiffs identify the Holy See as the relevant source of authority conferring or withholding discretion.[16]

---

[15] Some courts have held that U.S. domestic law provides the correct reference point for this analysis. *See, e.g.*, *Doe v. Fed. Democratic Republic of Ethiopia*, 189 F. Supp. 3d 6, 26–28 (D.D.C. 2016) (rejecting "Ethiopia's contention that Ethiopian law should govern the scope of the FSIA's discretionary function exc[lusion]," and concluding instead that U.S. criminal laws served as the appropriate reference point); *USAA*, 681 F.3d at 108–12 (looking to New York City Building Code to determine whether the Mission of Namibia to the U.N. had discretion to engage in challenged conduct). Other courts have referred to the foreign country's own law as the correct baseline. *See Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989) (explaining that employee "had no discretion, according to [the Republic of China's ('ROC')] courts, to violate the ROC law that prohibits murder"). Still other courts have examined a mix of the foreign state's law and international law, or a combination of domestic and international law. *See Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582, 591–92 (9th Cir. 2020) ("[T]he policy discretion of a foreign sovereign is not evaluated by those same constraints [of U.S. law], but rather by the corresponding limitations that bind that sovereign, whether contained in its own domestic law or (we will assume) in applicable and established principles of international law." (emphasis omitted)); *Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980) ("Whatever policy options may exist for a foreign country, it has no 'discretion' to perpetrate conduct . . . that is clearly contrary to the precepts of humanity as recognized in both national and international law.").

[16] Plaintiffs do not contend that domestic U.S. law should inform the *Berkovitz/Gaubert* prong one analysis. Although they suggest that the bishops "fail[ed] to report as may be required pursuant to [New York] law," Plaintiffs' Br. at 30, that bears on whether the bishops' alleged conduct was tortious (*i.e.*, whether the FSIA's tortious activity exception applies) but not on whether the bishops' actions involved an element of judgment or choice (*i.e.*, whether *Berkovitz/Gaubert* prong one is satisfied). Instead, Plaintiffs argue that, because alleged tortious

These differences in statutory context notwithstanding, Congress's rationale for creating the FSIA's discretionary function exclusion lends further support to our conclusion. In view of the comity considerations inherent in the FSIA context, construing the exclusion *not* to immunize a foreign sovereign when its employees obey a mandatory directive—as Plaintiffs urge—would lead to an odd result. While the federal government would be protected under the FTCA from liability stemming from an employee's adherence to a mandatory policy "because the action will be deemed in furtherance of the policies which led to the promulgation of the [policy]," *Gaubert*, 499 U.S. at 324, under Plaintiffs' interpretation, a foreign sovereign would not be entitled to the same protection under the FSIA, even though its employee's conduct adhering to its mandatory policy would likewise further the considerations that led to its promulgation of the policy. Permitting this divergence between the rulings in FTCA and FSIA contexts would undermine the comity rationale motivating the FSIA's discretionary function exclusion and the FSIA more generally.[17]

---

acts were committed "pursuant to [the Holy See's] mandatory secrecy policy," the "first prong of the *Berkovitz/Gaubert* test" precludes "application of the discretionary function exc[lusion]." Plaintiffs' Reply Br. at 15. At this juncture, then, we do not—and need not—decide whether courts considering the applicability of the FSIA's discretionary function exclusion should always look to U.S. law (as in, *e.g.*, *USAA*, 681 F.3d at 108–12) or to foreign law (as in, *e.g.*, *Liu*, 892 F.2d at 1431). Accordingly, we proceed on the assumption that, in this case, the correct reference point for the *Berkovitz/Gaubert* analysis is the foreign state's law—the law of the Holy See.

[17] *See generally* Restatement (Fourth) of the Foreign Relations Law of the U.S. § 457 (Am. L. Inst. 2018) (explaining that the discretionary function "exclusion was designed to place foreign states in the same position as the United States finds itself when sued under the [FTCA]"); Sienho Yee, Note, *The Discretionary Function Exception Under the Foreign Sovereign Immunities Act: When in America, Do the Romans Do as the Romans Wish?*, 93 Colum. L. Rev. 744, 770 (1993) ("This parity [between courts' interpretations of the discretionary function exception under the FTCA and the corresponding exclusion under the FSIA] fulfills the congressional desire to accord foreign sovereigns the same treatment that the U.S. government receives in U.S. courts."). Thus, a rule conferring immunity on a foreign sovereign for its employee's compliance with its mandatory

To be clear, we do not decide that the mere fact that a foreign sovereign has a mandatory policy allegedly governing conduct challenged as tortious will be dispositive in *every* case involving the discretionary function exclusion. In assessing whether the exclusion applies to bar jurisdiction, courts should carefully consider the relationship between the tortious conduct alleged and the precise policy purportedly mandating or prohibiting the conduct. *See, e.g.*, *Usoyan v. Republic of Turkey*, 6 F.4th 31, 38–45 (D.C. Cir. 2021) (identifying sources of law either granting or limiting Turkish security detail's authority to use physical force in the United States); *cf. Gaubert*, 499 U.S. at 322 ("[I]t is the nature of the conduct, rather than the status of the actor[,] that governs whether the exception applies." (internal quotation marks omitted)). In some cases, the alleged policy will be so general, or its relation to the challenged conduct so attenuated, that it makes little sense for its mere existence to be dispositive at *Berkovitz/Gaubert* prong one. *Cf. Usoyan*, 6 F.4th at 43–44 (observing that "[n]ot every law prescribes specific conduct," before concluding that "generally applicable laws prohibiting criminal assault did not give the Turkish security detail a sufficiently specific directive to strip Turkey of its immunity" for its employees' attacks on protestors outside the Turkish ambassador's residence in D.C. (internal quotation marks omitted)). Moreover, the discretionary function exclusion will not immunize acts that "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 n.7.

Here, however, the alleged policy is mandatory and specific, and the allegedly tortious conduct reflects a straightforward adherence to the policy. Plaintiffs' claims boil down to a challenge to the Holy See's considerations in deciding to promulgate the Policy. Thus, the bishops' actions in compliance with the Policy "will be deemed in

policy would promote Congress's goals, in enacting the FSIA, of respecting the dignity of foreign states and preserving the United States' interests in reciprocal situations.

furtherance of the policies which led to the promulgation of the [policy]." *Gaubert*, 499 U.S. at 324. Moreover, as discussed above in Section I.A.1., the alleged torts hinged on discretionary acts by bishops. Thus, *Berkovitz/Gaubert* prong one is satisfied.

To summarize: where plaintiffs seeking to overcome the discretionary function exclusion allege the existence of a mandatory policy that specifically governs the challenged conduct, to satisfy *Berkovitz/Gaubert* prong one, they must show that the allegedly tortious act "violate[d] the mandatory regulation." *Gaubert*, 499 U.S. at 324. This requirement is rooted in the Supreme Court's precedents interpreting the similar exception contained in the FTCA. It also comports with the comity considerations that animated Congress's enactment of the FSIA.

B. <u>The bishops' challenged conduct was susceptible to policy analysis, so *Berkovitz/Gaubert* prong two is also satisfied.</u>

As to the second *Berkovitz/Gaubert* criterion, the question is whether the bishops' allegedly tortious conduct was "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325; *see also Berkovitz*, 486 U.S. at 537 (noting FTCA's discretionary function exception "protects only governmental actions and decisions based on considerations of public policy"). Plaintiffs bear the burden of alleging "facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 324–25.

In *Gaubert*, the Supreme Court explained that some acts of government employees, while "obviously discretionary" and within the scope of their employment, do not come "within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 n.7. It offered as a quintessential example of such an act the case of a government employee who "drove an automobile on a mission connected with his official duties and negligently collided with another car," reasoning that, "[a]lthough

27

driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Id.*

Our own cases offer additional examples of acts that do not involve the exercise of policy judgment. For instance, in *Coulthurst*, an FTCA case, we concluded that a government employee's "absent-minded or lazy" conduct did not "involve 'considerations of public policy.'" 214 F.3d at 111 (quoting *Gaubert*, 499 U.S. at 323). The hypothetical examples we provided in *Coulthurst*—in which the plaintiff asserted claims arising from injuries caused by the government's alleged negligence in maintaining equipment in a prison gym—included a government employee's "decision (motivated simply by laziness) to take a smoke break rather than inspect the [gym] machines, or an absent-minded or lazy failure to notify the appropriate authorities upon noticing [a] damaged cable." *Id.* These actions, we explained, "d[id] not reflect the kind of considered judgment 'grounded in social, economic, and political policy' which the [discretionary function exception] is intended to shield from 'judicial second-guessing.'" *Id.* (quoting *Varig Airlines*, 467 U.S. at 814). Likewise, in *USAA*, we observed that "the failure to protect a wall during a construction project is not a matter of policy analysis." 681 F.3d at 113 (internal quotation marks omitted).

In contrast, judgments susceptible to policy analysis include, for example, decisions that require the government "to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." *Varig Airlines*, 467 U.S. at 820. More concretely, the Supreme Court in *Varig Airlines* concluded that the FAA's establishment of a system of "spot-checking" airplanes for compliance with safety standards represented a policy determination about what would "best accommodate[] the goal of air transportation safety and the reality of finite agency resources." *Id.*

28

In this case, the District Court concluded that the second prong of the *Berkovitz/Gaubert* test was satisfied. *Blecher*, 631 F. Supp. 3d at 173. We agree. The bishops' discretionary acts in assigning clergy to particular parishes, churches, and schools are the kind of resource allocation decisions that courts have consistently held to be susceptible to policy analysis. *See, e.g.*, *Swarna*, 622 F.3d at 146 (applying the discretionary function exclusion on the ground that plaintiff's failure to supervise claims against Kuwait alleged a "failure that occurred at the planning level of government"); *Molchatsky*, 713 F.3d at 162 (holding that discretionary function exception barred FTCA claim because challenged "choices regarding allocation of agency time and resources" were "grounded in economic, social and policy considerations"); *Simmons v. United States*, 764 F. App'x 98, 100 (2d Cir. 2019) (summary order) (decision to staff and assign security guard "is susceptible to policy analysis," and thus FTCA discretionary function exception applied to bar claim); *Two Eagle v. United States*, 57 F.4th 616, 623 (8th Cir. 2023) (holding that discretionary function exception barred FTCA claim because "allocation of staff time" and resources implicated policy considerations); *Burkhart*, 112 F.3d at 1217 ("The hiring, training, and supervision choices that [Washington Metropolitan Area Transit Authority] faces are choices susceptible to policy judgment." (internal quotation marks omitted)).

Moreover, as explained above, we see no daylight between the Holy See's secrecy policy and the bishops' allegedly tortious conduct of failing to warn and failing to report. The Holy See's policy confining disclosures of alleged abuse to specified internal mechanisms and otherwise prohibiting the advising of parishioners and law enforcement of suspected or alleged abuse, and the bishops' continuing to assign clergy suspected of abuse to parishes could have been the product of weighing various policy considerations—not only of factors like "parishioners' well-being," but also of factors like the church's reputation, "pastoral stability," "low ordination rates," or "staffing

29

shortages." *Doe v. Holy See*, 557 F.3d 1066, 1085 (9th Cir. 2009).[18] As the Ninth Circuit observed in a case involving similar claims against the Holy See, "the decision . . . whether to warn about [an employee's] dangerous proclivities" is "the type of discretionary judgment[] that the exclusion was designed to protect." *Id.* at 1084.

Other courts have likewise found that "[b]alancing safety, reputational interests, and confidentiality is the kind of determination 'the discretionary function exc[lusion] was designed to shield.'" *Croyle v. United States*, 908 F.3d 377, 382 (8th Cir. 2018) (quoting *Berkovitz*, 486 U.S. at 536). The plaintiff in *Croyle*, who alleged that he was sexually assaulted by a priest stationed at an Army hospital, sued the federal government under the FTCA for negligent supervision and failure to warn of the priest's history of sexual abuse. *Id.* at 380. As relevant here, Croyle contended that the government failed to satisfy *Berkovitz/Gaubert* prong two on the ground that "no conceivable policy choice would allow [the priest] access to children without a warning." *Id.* at 381. The Eighth Circuit rejected Croyle's argument, reasoning that the government, "in determining whether to warn families or take other protective action," could have balanced a number of considerations, including "public and child safety," "the need to protect [the priest]'s reputation and confidentiality," "staffing shortages," and the reputation of the hospital and other religious personnel at the hospital. *Id.* at 382. Although "there may be disagreements [about] how these interests should be balanced"—and although in some situations, as in *Croyle* and in this case, the balancing of these interests may produce appalling and tragic results—Congress did not intend to

---

[18] Whether the bishops' acts and omissions here were *in fact* grounded in the Holy See's policy considerations is of no moment. As our precedent makes clear, the discretionary function exclusion applies not only where the foreign sovereign "has *actually* undertaken a public policy analysis, but also where the decision at issue is merely '*susceptible* to policy analysis.'" *Cangemi*, 13 F.4th at 133 (quoting *Gaubert*, 499 U.S. at 325) (emphases in original).

"empower judges to second guess such decisions via tort action." *Id.* at 382–83 (internal quotation marks omitted).

Plaintiffs urge that there can be no plausible policy justification for maintaining the strict secrecy of illegal conduct, *i.e.*, cleric sexual abuse of children. In support, they rely primarily on another FTCA case, *Tonelli v. United States*, 60 F.3d 492 (8th Cir. 1995), decided by the Eighth Circuit. But *Tonelli* is distinguishable, in our view, and has little application to the facts here. In *Tonelli*, the Eighth Circuit concluded that the post office's alleged failure to supervise its employees properly even after it was on notice of ongoing illegal action—a postal employee was tampering with mail, a federal crime— "d[id] not represent a choice based on plausible policy considerations." *Id.* at 496. As an initial matter, *Tonelli* involved negligent hiring and supervision claims, not failure-to-warn claims. *See id.* Further, the *Tonelli* plaintiffs' theory hinged on an asserted *violation* of a mandatory policy—unlike the alleged *compliance* with a mandatory policy at issue in this case. Accordingly, we find *Doe* and *Croyle* instructive for our purposes, and *Tonelli* much less so.

Ultimately, however ill-advised their judgment may have been, the bishops could well have decided that their challenged actions "best accommodate[d]" their competing policy goals and concerns, *Varig Airlines*, 467 U.S. at 820, and thus their allegedly tortious conduct in complying with the mandated secrecy policy was "susceptible to policy analysis," *Gaubert*, 499 U.S. at 325.[19]

---

[19] Plaintiffs further allege that, in December 2019, Pope Francis issued a directive to bishops reversing the Holy See's dated mandatory secrecy policy. The 2019 directive provided, they assert, that "those reporting the crime of child sexual abuse . . . shall not be bound by any obligation of silence." Am. Compl. ¶ 73, App'x at 40 (internal quotation marks omitted). This alleged reversal in the Holy See's policy regarding the handling of reported or suspected child sexual abuse underscores our point that the judgments involved here are susceptible to the

*   *   *

We in no way condone the horrific abuse alleged by Plaintiffs and acknowledged by the Holy See. *See* Oral Argument Tr. at 10:9–14. But the question before us is whether the Holy See, a foreign sovereign, is immune under the FSIA from suit in the courts of this country for the bishops' alleged failures to warn and to report, not whether the secrecy policy or the bishops' actions were justifiable.

In sum, because Plaintiffs' allegations of harm hinge on discretionary actions by the bishops and Plaintiffs fail to allege that the bishops' conduct violated the Holy See's mandatory secrecy policy, *Berkovitz*/*Gaubert* prong one is satisfied. And because the challenged conduct was susceptible to policy analysis, *Berkovitz*/*Gaubert* prong two is met. Accordingly, the discretionary function exclusion from the tortious activity exception of the FSIA bars the court from exercising jurisdiction over Plaintiffs' claims against the Holy See.[20]

## CONCLUSION

For the reasons set forth above, the judgment of the District Court is **AFFIRMED**.

---

balancing of policy considerations—judgments that are best reserved for foreign sovereigns, not courts.

[20] The Holy See advances an alternative ground for affirming the District Court's judgment. It avers that the misrepresentation exclusion from the tortious activity exception, 28 U.S.C. § 1605(a)(5)(B), applies here and that the District Court therefore lacks jurisdiction under the FSIA over the Holy See for this reason as well. *See* Holy See Br. at 41–47. Because we affirm the District Court's judgment of dismissal on other grounds, we do not address the Holy See's alternative argument.